## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOES NOS. 1-10, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. |
| PETER J. NYGARD, NYGARD INC., NYGARD INTERNATIONAL PARTNERSHIP, AND NYGARD HOLDINGS LIMITED | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

This is a civil class action for damages under the United States Federal sex trafficking statute, 18 U.S.C. §§ 1591, *et seq.*, arising from Defendant Peter J. Nygard's ("Nygard") rape and sexual assault of Plaintiffs, Jane Does Nos. 1-10, and the other members of the Classes proposed below (the "Class"), in the United States, the Commonwealth of the Bahamas, and elsewhere around the world. Defendants, using interstate and foreign commerce, recruited, lured, and enticed young, impressionable, and often impoverished children and women, with cash payments and false promises of lucrative modeling opportunities to assault, rape, and sodomize them. Nygard used his considerable influence in the fashion industry, his power through corruption of officials, and a network of company employees under his direction, to groom and entice underage girls and women. Defendants knew that Nygard would use means of alcohol, drugs, force, fraud, and/or other forms of coercion to engage in commercial sex acts with these children and women, and, in many cases, with knowledge that they were less than eighteen years old. Defendants knowingly benefited from, and received value for, their participation in the venture, in which Nygard, with

the Nygard Companies' knowledge, or in reckless disregard of the fact, that Nygard would defraud, force, and/or coerce Jane Does Nos. 1-10 and other Class members—many of whom were under the age of eighteen—to engage in commercial sex acts.

Defendants Nygard Inc. and Nygard International Partnership ("Nygard International"), with their global headquarters near Times Square in New York City, and Nygard Holdings Limited ("Nygard Holdings"), were instrumental in knowingly aiding, abetting, facilitating, and participating in Defendants' decades-long sex trafficking scheme, while knowing, or in reckless disregard of the fact, that Nygard would use means of force, fraud, and/or coercion, or knowing that the person had not attained the age of eighteen years, to force vulnerable children and women to engage in commercial sex acts in violation of the Trafficking Victim Protection Act ("TVPA"). Nygard owned, directly and/or indirectly, all of these companies, controlled them, had them commingle funds with each other, avoided all corporate formalities between them, and used them to commit his unlawful acts.

Defendants' destruction of innocent lives is immeasurable.  When Nygard became aware of the investigation into his sex trafficking ring, he resorted to tactics of violence, intimidation, bribery, and payoffs to attempt to silence the victims and to continue his scheme.

## **INTRODUCTION**

1.     Nygard is, in his own words, a world-renowned fashion designer.  By others, Nygard "has been accused of abusive labor practices, tax evasion, sexual harassment and rape."[1]

2.     Nygard is the founder, chairman, figurehead, former chief executive, and icon of Nygard Inc., Nygard International, and Nygard Holdings (together, the "Nygard Companies").

---

[1] https://www.forbes.com/forbes/2010/1206/features-peter-nygard-sexual-harassment-answers-to-no-one.html#236f0e30bc9b

3.      Directly or indirectly, Nygard owned 100% of the Nygard Companies at the time of the acts detailed in this Complaint.

4.      Further, Nygard entirely controls each of the Nygard Companies.  He calls all the shots and is accountable to no one.  His Board consists of himself and two division presidents.[2]

5.      The Nygard Companies comingle funds and do not observe corporate formalities.

6.      Nygard is the Nygard Companies; the Nygard Companies are Nygard.

7.      Indeed, Nygard proclaims in public filings that he and his businesses are "closely associated in the public eye."[3]

8.      The Nygard Companies' promotional materials and advertisements also make the companies synonymous with "one man," Nygard, who is featured individually on almost all promotional materials and advertisements.[4]

9.      Nygard and his businesses are "closely identified in the public mind, similar to other fashion houses."[5]

10.     Nygard Inc. and Nygard International have their global headquarters near Times Square in New York City.

11.     Nygard and his companies have repeatedly invoked the jurisdiction of the United States courts, including the courts in this District, by filing lawsuits in multiple United States courts.[6]

---

[2] *Id.*

[3] Complaint at ¶ 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D.N.Y. Jan. 5, 2017), at ¶¶ 1, 31.

[4] *See, e.g.*, video at https://corporate.nygard.com/.

[5] *See* Complaint at ¶ 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

[6] *See, e.g. Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027, 2017 WL 4303825 (S.D. Fla. Jan. 5, 2017); *Nygard International Partnership v. Feralio*, No. B266683, 2017 WL 4784925 (Cal. Ct.

12.     Nygard has a residence in New York City, which is above his flagship store near Times Square.  Nygard International leases this building.

13.     Nygard also resides in California and Florida.

14.     Nygard also owns the companies Nygard NY Retail, LLC, Nygard Partners, LLC, and Orion Asset Management, Inc., each of which is a New York corporation.

15.     At the heart of this action is Nygard's use of the Nygard Companies to facilitate and enable the rape and sexual assault of underaged girls and women in the United States, the Bahamas, and elsewhere around the world.

16.     The Nygard Companies fund Nygard's illegal sex trafficking venture, and Nygard uses the Nygard Companies' brand, resources, and promotional events to recruit, lure, and/or entice his victims and force or coerce them, or knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts.

17.     In turn, the Nygard Companies knowingly benefit from their participation in Nygard's venture by the continued promotion of the Nygard brand and by using Nygard's full-time sex workers to render services to the Nygard Companies.

18.     Nygard, using the Nygard Companies' resources, engaged in a pattern and practice of recruiting, luring, enticing, and obtaining underaged girls and women, and causing them through force, fraud or coercion, or knowing that the victim had not yet attained the age of eighteen years, to engage in commercial sex acts through, among other means, promising lucrative modeling opportunities, providing cash payments, drugging his victims, confiscating his victims' passports,

---

App. Oct. 24, 2017); *Nygard v. Jasper*, No. 8:15-cv-1939-T-33EAJ, 2016 WL 9526666 (M.D. Fla. Jan. 4, 2016); *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027 (Cal. Ct. App. 2008); *Nygard, Inc. v. Kustannusosakeyhtio Iltalehti*, No. B192639, 2007 WL 1775963 (Cal. Ct. App. June 21, 2007).

preventing his victims from exiting the Nygard Cay property in the Bahamas and properties in the United States, threatening victims with physical violence, and using physical force against them.

19.     Nygard recruited, lured, and enticed some of his victims, as alleged herein, to engage in commercial sex acts in, among other places, California and New York.

20.     The Nygard Companies have actual knowledge of Nygard's unlawful commercial sex acts through him, as he is the founder, chairman, and 100% owner of the Nygard Companies.

21.     Further, the Nygard Companies knowingly aided and abetted, facilitated, and participated in Nygard's illegal sex trafficking venture by being integrally involved in the sex trafficking, assault, and rape of children and young women, examples of which are listed below.

    a.     Nygard used the Nygard Companies' money, brand, and resources to facilitate and commit commercial sex acts in the United States, Bahamas, and elsewhere around the world.

    b.     Nygard hosted regular company events known as a "pamper parties,"[7] in the Bahamas and California under the Nygard brand, to both promote the Nygard Companies' brand and facilitate commercial sex acts.  In doing so, Nygard was acting on behalf of the Nygard Companies, under the brand and reputation of the Nygard Companies, and using the Nygard Companies to commit his crimes.

    c.     Nygard used fraud and deceit to knowingly lure and entice children and women to his Nygard Cay property under the false pretense of attending "pamper parties" and promising, among other things, interviews for lucrative modeling opportunities when, in fact, he had no intention of fulfilling his empty promises.

---

[7] *See* https://www.youtube.com/watch?v=WPFz3_yfj2I

d.  The Nygard Companies funded Nygard's "pamper parties" under the Nygard brand by transferring cash from its bank account in Canada, routing it through New York, and depositing it in a Bahamian bank account that belongs to a Bahamian holding company called Nygard Holdings.

e.  The Nygard Companies used corporate accounts to pay for drugs, alcohol, entertainment, and food for the "pamper parties," and also provided the cash that Nygard delivered to accomplices and victims to facilitate Nygard's commercial sex acts with children and young women.

f.  The Nygard Companies also paid all employees and staff, including accomplices who recruited and groomed children and women to engage in commercial sex acts, who worked the "pamper parties."

g.  Nygard used the Nygard Companies' boats, including, but not limited to, the "Yves Lauren," and "Lady Hilkka," at least one of which is docked in Florida, for months at a time, to transport drugs, liquor, and supplies for the "pamper parties."

h.  Nygard used the Nygard Companies' employees and the Nygard Companies' customized "N-Force" jet to transport his victims from the Bahamas to destinations in the United States and around the world including, without limitation, his residences in California, Florida, and New York.

i.  Nygard also used the Nygard Companies' resources including, without limitation, the corporate jet, to smuggle women, drugs, liquor, and other supplies into and out of various jurisdictions including, without limitation, the United States and the Bahamas.

j.   The victims that Nygard found most attractive and sexually desirable were forced through a combination of fraud, coercion, psychological force and manipulation, and physical force, or knowing that the victim had not attained the age of eighteen years, to become full-time sex workers, which he referred to as his "girlfriends." Nygard's "girlfriends" were coerced and enticed to move into his Nygard Cay property with promises of money and/or future modeling opportunities, where they were not allowed to leave without his express permission.  They were forced to meet his every demand including, without limitation, "recruiting" new victims to attend his "pamper parties" so that Nygard could continue his pattern and practice of forcing children and women into commercial sex acts.

k.   Nygard's "girlfriends" were also forced to accompany him on Nygard Companies-sponsored fashion tours in the United States, Canada, and elsewhere around the world, where they were required to commit commercial sex acts that satisfied his perverse sexual desires, "recruit" new victims for him while on tour, and provide services to the Nygard Companies.

l.   Nygard's "girlfriends" were always paid varying amounts of cash in United States currency, submitted to and provided by the Nygard Companies' financial personnel, and paid directly by Nygard to help ensure their compliance and silence. Nygard's longtime "girlfriends" were also put on the Nygard Companies' official payroll.  They were paid monthly through direct deposit with funds from a Nygard corporate account by the Nygard corporate accountant.  They were required to submit invoices that stated that they were being paid for "modeling and promotional services"—even though they were full-time sex workers.  Every payment had to be

directly approved by Nygard himself.  The amounts of their payments were based upon their level of servitude to Nygard, their ability to satisfy his sexual desires, and their ability to "recruit" new victims for him to engage in commercial sex acts with.

m.  Travel arrangements for Nygard's "girlfriends" and victims were made through Nygard's corporate travel department, which is headquartered in the United States.

n.  Nygard frequently took his "girlfriends" and victims to his New York City residence.  He regularly forced his "girlfriends" to accompany him to "swingers" clubs in New York City. While at the "swingers" clubs, Nygard forced his "girlfriends" to find couples for him to have sex with.  He then paid, forced, and/or coerced his "girlfriends" to have sex with other men, while he watched and engaged in sex with the men's partners.  Nygard treated sex like a currency.

o.  Nygard used employees paid by the Nygard Companies, using Company-owned computers, email, phones, and social-media accounts to lure his victims to locations in the United States, the Bahamas, Canada, and elsewhere around the world, so that Nygard could use force, fraud and coercion, or knowing the victim had not attained the age of eighteen years, to cause them to engage in commercial sex acts.

p.  Nygard kept a database of potential victims that was maintained by the Nygard Companies' corporate information technology ("IT") department on the corporate server (mostly maintained in the United States).  By the mid-2000s, this database was confirmed to have contained information on over 7,500 underage girls and women.

q.  The Nygard Companies and Nygard employed people to work at what Nygard referred to as Nygard's Corporate Communications Coordinators ("ComCor"). Among other duties, ComCor employees were used to ensure that Nygard's potential victims attended the "pamper parties" by contacting them and arranging for their transportation to the parties.  Thereafter, Nygard seduced, coerced, incited, paid, and promised these victims modeling careers to cause them to engage in commercial sex acts.  All ComCor employees were paid by the Nygard Companies.

r.  Upon arrival at the gated Nygard Cay property, most of Nygard's victims were required to "register" with ComCor, which was in charge of planning and coordinating corporate events, by providing their personal information, such as their names, telephone numbers, email addresses, and the identities of the persons who invited them.  They were also required to pose for headshots and full-body photographs.  The pictures and registration forms, filled out by the Nygard employees, were scanned and emailed directly to Nygard, so that he could review who was in attendance, while sitting upstairs in his bedroom.  Nygard would then use this information to select his potential victims for the night, by meeting his self-avowed standard of: "an eight in the face, and a nice toilet."

s.  The information was then entered into a Company database, so that Nygard had a ready list of "prospective recruits" who were potential victims to pursue at any given time.  The database contained information and pictures of over 7,500 underage girls and women dating back to 1987.  The database was hosted on a corporate server and was maintained by the Nygard Companies' IT department.

Nygard's head of IT, Daane Clifford,[8] died suddenly just a few months ago (just a few weeks after *The New York Times* was known to be investigating this story), at the age of 44.

t.  Nygard's ComCor was used to keep track of, make contact with, and lure potential victims to Nygard Cay through the database.  Nygard instructed the Company-paid employees to call potential victims to invite them to "pamper parties," transport girls to and from the "pamper parties," or to otherwise pay for their transportation.

u.  Nygard's ComCor also used social media to post about "pamper parties" and to direct-message potential victims who met Nygard's specifications to invite to "pamper parties."  Nygard's ComCor knowingly recruited these victims for Nygard and were paid by the Nygard Companies, with cash routed through New York and paid out of Nygard corporate accounts.

v.  Using the Nygard Companies' resources, including United States currency, Nygard, on his own and through his direction to his employees, paid his victims for the commercial sex acts.

w.  Nygard used his financial resources, influence, power in the Bahamas, and psychological manipulation to intimidate his victims and to ensure that his crimes were not reported.  Those of his "girlfriends" who tried to leave him were harassed and threatened by Bahamian police who were on Nygard's payroll (and who were paid with Nygard Companies' United States currency).

---

[8] *See*  https://www.linkedin.com/in/daane-clifford-9a180332/?originalSubdomain=ca;  *see also* https://www.dignitymemorial.com/obituaries/langley-bc/daane-clifford-8735816.

x.  Nygard made a concentrated and deliberate effort to protect and conceal his criminal activities. Specifically, Nygard initiated a scheme to purchase police protection and political cover in the Bahamas by making regular payments of tens of thousands of dollars to law enforcement, government officials, regulators, and even to a former Cabinet Minister who became the Prime Minister of the Bahamas. This scheme was so successful that victims who escaped Nygard Cay were often brought back to the Cay by the Bahamian police.

y.  In an effort to reinforce fear, control, and dominance over his victims, Nygard regularly flaunted his political power to control the Bahamian police and the Bahamian government by inviting and parading government officials at his Nygard Cay property and in front of Nygard's victims.

z.  Nygard also paid people, using Nygard Company money, to intimidate his former "girlfriends" by slashing their tires, committing arson, paying police to threaten to arrest them, and by having them followed.

22.  Nygard intentionally used the Nygard Companies' resources and brand to recruit, lure, and entice children and women to cause them to engage in commercial sex acts and other degrading acts, for which he always provided Nygard Companies' resources as value.

23.  Further, the Nygard Companies knowingly financed Nygard's commercial sex acts.

24.  The Nygard Companies marketed Nygard's playboy image, the Nygard Cay property, and "pamper parties" as part of the Nygard brand, which benefited the Nygard Companies[9] and provided Nygard with access to a steady supply of victims.  Nygard's public

---

[9] https://ewnews.com/711-rapes-presented-to-hospitals-since-july-2013; https://www.youtube.com/watch?v=Hb64u6hDxfI;

image in that regard was used to promote the Nygard brand and its products in the Bahamas and around the world, as well as to facilitate his sex trafficking.

25.     The Nygard Companies knowingly benefited financially from Nygard's sex-trafficking venture.   By facilitating Nygard's commercial sex acts in foreign commerce, the Nygard Companies enjoyed the promotion and promulgation of the Nygard Companies' projects internationally.   Nygard is the face of the Nygard Companies, and his presence and promotion in foreign commerce brought exposure and prestige to the Nygard Companies.

26.     The Nygard Companies facilitated Nygard's commercial sex acts in foreign commerce to obtain the enormous publicity that Nygard garnered by promoting the Nygard Companies' products internationally, as well as acting as a pimp between high powered individuals who, in return, gave favorable dealings to the Nygard Companies, which financially benefited the Nygard Companies.

27.     The Nygard Companies also benefited from the services that Nygard's sex workers were forced to provide to the Nygard Companies including, without limitation, modeling company clothing for company executives, their clothing design ideas, preparing Nygard for his business meetings, attending business meetings, and perpetuating Nygard's playboy image, which is a crucial component of the Nygard brand.

28.     This Paragraph's table synthesizes the horrific details (presented in greater detail later on in this Complaint) of Nygard's rape and sexual assault of Jane Does Nos. 1-10, effectuated and facilitated through the Nygard Companies' resources, assets, and employees.   The table details Nygard's penchant for vicious, unimaginable rape of children and women.

---

https://www.youtube.com/watch?v=WPFz3_yfj2I;
https://www.youtube.com/watch?v=nIJWrU9wq7w

| Age When Raped by Nygard | Jane Doe No. | Details About Rape | Nygard Companies' Involvement |
|---|---|---|---|
| 14 | 1 | Nygard showed her pornography of a man rubbing feces over a woman's body.<br><br>Over her objections, Nygard used force and fear to have her penetrate his anus with a lubricated dildo, while he masturbated.<br><br>Nygard approached her and she asked him to stop. Nygard, ignoring her rejection, reached around her neck, began unzipping her dress, put on a condom, kissed her, and began to open her legs. As she tried to close her legs and push him off of her, he held her hands back and pinned them against the headboard.<br><br>The victim, a virgin, cried as Nygard forced his penis into her vagina, causing extraordinary trauma and pain. | Nygard workers took pictures of her when she was changing in a Nygard store.<br><br>ComCor workers called her to invite her to a "pamper party."<br><br>After being raped at the "pamper party," she went back to the dining area, where she found the two Nygard employees who brought her there. A Nygard employee escorted her to a car and transported her back home.<br><br>The Nygard Companies supplied the cash paid to the victim. |
| 14 | 2 | Over her objections, Nygard served her several glasses of wine. Nygard's employees brought him a bag of pills. Nygard gave her three pills and instructed her to take them all at once with her wine.<br><br>Nygard then led her to his bedroom. There, Nygard removed her pants and underwear and attempted to force a dildo into her vagina. She resisted and told him to stop because it hurt. But Nygard did not stop; instead, he instructed her to "relax" and stated that "it has to be done sooner or later." At that point, she blacked out and does not know what Nygard did to her while she was unconscious. | Upon reaching Nygard Cay for a "pamper party," ComCor employees took down her contact information and photographed her.<br><br>A ComCor employee WhatsApp text messaged her to invite her to another "pamper party."<br>A Nygard employee transported her to the "pamper party."<br><br>At the "pamper party," Nygard's driver escorted her and introduced her to Nygard. |

| | | | |
|---|---|---|---|
| | | The next morning she woke and saw Nygard still sleeping next to her in the bed.  She immediately got out of bed and noticed blood on the sheets.  She went to the bathroom and immediately cleaned herself up.  There was blood around her vagina.<br><br>Nygard gave her approximately $5,000 in $100 bills in U.S. currency.  She initially refused to take the money, but Nygard insisted.<br><br>She was a virgin prior to being raped by Nygard.<br><br>On another visit to a "pamper party," Nygard had her play with his genitals and had her penetrate his anus with a lubricated dildo.<br><br>After this second instance of rape, Nygard began paying her to be a Nygard model and to recruit other young girls for him to sleep with, so that she would not have to satisfy his perverse sexual desires herself.  Nygard would instruct her to offer the young girls drugs.  Each time that she visited Nygard Cay and recruited girls for him, Nygard gave her a large sum of cash—never less than $2,000 and always in U.S. currency.<br><br>At another visit to Nygard Cay for a "pamper party," Nygard insisted that she defecate and/or urinate in his mouth.  She responded that she did not wish to do that to him.  He offered to give her drugs that would help her defecate.  She told Nygard no and decided that she could no longer take Nygard's perverse sexual fetishes. | After she woke up from her first instance of being raped, Nygard's assistant came up to the room to escort Jane Doe No. 2 downstairs.  On the way downstairs, Nygard's assistant asked her if she was okay and if she would ever return to Nygard Cay.  Jane Doe No. 2 responded that she would think about it.  Nygard's assistant explained that Nygard was not really a bad person but was just selfish at times.<br><br>On a separate occasion, a ComCor employee texted her to come to another "pamper party."<br><br>After her other visit to Nygard Cay, during which she was forced to play with Nygard's genitals and penetrate his anus with a dildo, she received numerous text messages from a Nygard ComCor employee inviting her to travel with Nygard to Ohio, Canada, and New York.<br><br>The Nygard Companies supplied the cash paid to the victim. |
| 15 | 3 | Jane Doe No. 3 is the older cousin of Jane Doe No. 4 (referenced in the row below). | A ComCor employee, found Jane Doe No. 3 in her neighborhood and arranged |

| | | | |
|---|---|---|---|
| | | In Nygard's bedroom during a "pamper party," he offered her two glasses of wine, which she accepted.<br><br>Nygard asked her if she had sex before; she said no. At this point, she became afraid.<br><br>Nygard sat her on the bed and began to rub her legs and face. He sat down next to her and slowly pushed her body back onto the bed. Nygard took a condom from the drawer and put it on. He began kissing her on her stomach; she began trembling in fear.<br><br>She shouted "no" and began to cry. Nygard grabbed her closer, put all of his weight on her, and penetrated her vagina with his penis. She told him to stop and resisted him, but he continued.<br><br>After Nygard ceased vaginally raping her, she was bleeding from her vagina. There was also blood on the sheets.<br><br>At another "pamper party" at which Jane Doe No. 3 and her cousin, Jane Doe No. 4, were present, Jane Doe No. 3's mother came outside the Nygard Cay gate and threatened to call the police if they did not let her in to retrieve the girls. Jane Doe No. 3's mother was shouting at the gate to retrieve the girls. Ultimately, Jane Does Nos. 3 and 4 left with Jane Doe No. 3's mother. | for her to be picked up and escorted to Nygard Cay the next day for a "pamper party."<br><br>At the "pamper party," the ComCor employee ushered Jane Doe No. 3 to Nygard's bedroom, where he was waiting.<br><br>After Nygard raped Jane Doe No. 3 in his bedroom, the ComCor employee returned to the bedroom to pick up Jane Doe No. 3. The ComCor employee asked Jane Doe No. 3 if she was okay. Jane Doe No. 3 responded that she was afraid.<br><br>Before Jane Doe No. 3 left the ComCor employee, on behalf of Nygard, handed Jane Doe No. 3 approximately $200 in U.S. currency.<br><br>The week following Nygard raping Jane Doe No. 3 at a "pamper party," Jane Doe No. 3's friends showed her a text message from the ComCor employee, who instructed them to go to Nygard Cay.<br><br>The Nygard Companies supplied the cash paid to the victim. |
| 14 | 4 | Jane Doe No. 4 is the younger cousin of Jane Doe No. 3 (referenced in the row above). | She was registered at the security station at the Nygard Cay gate when attending a "pamper party." |

| | | At the "pamper party," she was given an alcoholic drink. | A ComCor employee was with Jane Doe No. 4 at the "pamper party." |
| --- | --- | --- | --- |
| | | Nygard escorted her to his bedroom. Once they arrived in the bedroom, Nygard invited her to get comfortable on the bed.  Nygard turned on the television, which was playing pornography showing a woman having oral sex with a man. | The Nygard Companies supplied the cash paid to the victim. |
| | | Nygard sat down on the bed next to her and began stroking her hair and rubbing her back.  She was uncomfortable and asked him if this was his way of talking about modeling, and he replied that he just wanted to have sex with her. Nygard began removing his clothes and moved toward her.  He pulled the strings on her bathing suit, removing it, and began licking her neck, moving downward until he began performing oral sex on her. | |
| | | She attempted to close her legs, but Nygard pushed them open.  She continued to try to close her legs, but he overpowered her. | |
| | | Nygard then moved upward and began to penetrate her vagina with his penis. | |
| | | After some time, he then instructed her to perform oral sex on him until he ejaculated. | |
| | | Prior to this rape, she was a virgin. | |
| | | Afterwards, Jane Doe No. 4 went into the bathroom and took a shower. Nygard gave her a white envelope when she came out and told her "this is for you."  Nygard then told her to give him his contact information and that he would contact her about modeling.  The | |

| | | | |
|---|---|---|---|
| | | envelope contained approximately $5,600 in U.S. currency. | |
| 17 | 5 | Jane Doe No. 5's friend, invited her to a "pamper party."  While at the party, Jane Doe No. 5 consumed multiple alcoholic beverages.<br><br>While they were drinking on the beach, Nygard approached her friend and gestured at her to follow him. Her friend motioned to Jane Doe No. 5 to come with her because she did not want to go with Nygard alone.<br><br>Nygard took them up to his bedroom and gave them more to drink.  Jane Doe No. 5 began to feel very "loose." Nygard instructed the girls to touch one another sexually, and they complied. After several minutes, Nygard joined and began touching the girls. During the encounter, Nygard sodomized Jane Doe No. 5 against her will.  Afterwards, she was bleeding from her anus.<br><br>Nygard then asked the girls to defecate on him, but neither of them could do so.<br><br>Nygard gave Jane Doe No. 5 $200 in U.S. currency and led the girls downstairs.  He gave permission for them to leave, and they were driven home. | Jane Doe No. 5 and her friend were transported to and from Nygard Cay by a Nygard Company employee.<br><br>Upon arriving, they were registered by the Nygard Companies' ComCor employees.<br><br>The Nygard Companies supplied the cash paid to the victim. |
| 15 | 6 | Jane Doe No. 6 was invited to Nygard Cay by the Nygard Cay DJ, named "Shorts." While at the "pamper party," an acquaintance introduced her to Nygard and told her Nygard could get her some marijuana to smoke.  Nygard invited her upstairs to smoke marijuana. | Jane Doe No. 6 was invited to a "pamper party" at Nygard Cay by the Nygard Cay DJ, "Shorts."<br><br>The Nygard Companies supplied the cash that Nygard attempted to pay the victim. |

| | | | |
|---|---|---|---|
| | | Nygard took her to his bedroom.  He undressed and got into the Jacuzzi.  After Jane Doe No. 6 declined to get in with him, he got out of the Jacuzzi and began to undress her.<br><br>Nygard asked her to defecate in his mouth but she said no.<br><br>Nygard began fondling her and stuck his finger in her anus.  She tried to fight Nygard off and told him to stop, but the more she fought the more aggressive he became.<br><br>Nygard attempted to sodomize Jane Doe No. 6 but was unable to penetrate her anus.  He then raped her vaginally.<br><br>Nygard instructed Jane Doe No. 6 to take a wad of cash in U.S. currency, but she refused.  He gave her and her friends permission to leave, and they drove home.  She never returned to Nygard Cay. | |
| 18 | 7 | Jane Doe No. 7 was invited to a "pamper party" at Nygard Cay by a friend.  Upon arrival, she was registered with ComCor and her photo was taken.<br><br>Jane Doe No. 7 had several alcoholic beverages at the "pamper party."  Nygard approached her and led her upstairs to his bedroom.<br><br>Nygard invited her into the Jacuzzi and began making sexual advances, but she resisted.  Nygard then made a drink for Jane Doe No. 7, which she drank completely.  Afterwards, she felt nauseated and very sleepy.<br><br>Nygard asked Jane Doe No. 7 to urinate in his mouth.  She does not recall what | Upon arriving, Jane Doe No. 7 was registered by the Nygard Companies' ComCor employees.<br><br>The Nygard Companies supplied the cash paid to the victim. |

| | | | |
|---|---|---|---|
| | | happened next because she was in and out of consciousness. Jane Doe No. 7 awoke, there was blood in the back of her underwear, and she had pain in her anus.  Nygard gave her $550 in U.S. currency and sent her away. | |
| 29 | 8 | Jane Doe No. 8 was a key employee of Nygard Cay for several years, providing services for guests and for Nygard from 2008-2014. In 2014, Jane Doe No. 8 was raped.  She rarely drinks while at work; however, she accepted a glass of wine from one of Nygard's girlfriends shortly before being summoned to Nygard's room. Shortly after arriving, she noticed her arms become numb and then she fell unconscious.  When she became alert again, Nygard was in the act of penetrating her vagina with his penis. She continued to work there after this incident out of financial necessity, although she did what she could to avoid coming in contact with him.  Nygard demanded that Jane Doe No. 8 begin to have sex with him regularly as a requirement of keeping her job; when she refused, she was terminated. In April of 2017, Jane Doe No. 8 was abducted for four days and flown to Toronto and Fort Lauderdale by employees of Nygard, in furtherance of Nygard's agenda. | Jane Doe No. 8 was employed and paid by the Nygard Companies. Jane Doe No. 8's continued employment with the Nygard Companies was conditioned upon sex with Nygard. Resources of the Nygard Companies were used to abduct Jane Doe No. 8. |
| Adult | 9 | Jane Doe No. 9 was an employee of Nygard and the Nygard Companies. Over the years she was sexually assaulted by Nygard on numerous occasions. | Jane Doe No. 9 was an employee of the Nygard Companies.  Nygard used her continued employment and payment as a means to |

| | | | |
|---|---|---|---|
| | | In 2015, she was raped by Nygard at his residence in Marina Del Ray, California. He overrode the lock on her guest room bedroom and entered without her permission. She awoke to him forcefully and physically attempting to rape her. Despite her attempts to resist and to tell him "no," he forcefully penetrated her. | control and to coerce her into sex acts. |
| 15 | 10 | Jane Doe No.10 attended a "pamper party" at Nygard Cay when she was fifteen years old. After eating food at Nygard Cay, she began to feel dizzy and nauseous.<br><br>Jane Doe No. 10 was approached by Nygard and his security guard and was taken to his bedroom, where Nygard began making sexual advances toward her.<br><br>Jane Doe No. 10 told Nygard that she was fifteen years old and that she was not feeling well. Nygard gave Jane Doe No. 10 a white pill and told her it would make her feel better.<br><br>Nygard then raped Jane Doe No. 10, both vaginally and anally. Nygard also offered Jane Doe No. 10 money to defecate in his mouth.<br><br>Following the rape, Jane Doe No. 10 subsequently sought medical treatment and received two stitches in her anus to stop the bleeding. | The Nygard Companies paid for the food and drugs that were provided to Jane Doe No. 10.<br><br>The Nygard Companies paid the employees, including Nygard's security guard, that worked and organized the "pamper party." |

29.    Nygard's conduct, as outlined above, violates the TVPA, which outlaws using means of interstate or foreign commerce to recruit, entice, obtain, or lure a person and force or coerce that person, or knowing that the person had not attained the age of eighteen years, to engage

in commercial sex acts.  The Nygard Companies are guilty of aiding and abetting Nygard's violations of the TVPA by knowingly facilitating and enabling his illegal conduct.

30.     The Nygard Companies also directly violated the TVPA because they knowingly benefitted from participation in Nygard's venture with knowledge, or in reckless disregard of the fact, that Nygard used means of force, threats of force, fraud, and coercion to force children and women into engaging in commercial sex acts.

## JURISDICTION AND VENUE

31.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs bring this action—individually and on behalf of the other Class members—under the federal TVPA statute.

32.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

33.     This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, as venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Nygard Inc. and Nygard International, both headquartered near Times Square in New York City, conduct substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Nygard's illegal venture through actions that originated in this District.  Venue is also proper in this District under 28 U.S.C. § 1391(b)(3), because Defendants are subject to personal jurisdiction in this District and there is no other district where the action may be brought.

## PARTIES

A.     **Plaintiffs**

34.     Plaintiffs Jane Does Nos. 1-10 are using pseudonyms to protect their identities because of the sensitive and highly personal nature of this matter.

21

35.    Plaintiffs are also at serious risk of retaliatory harm because Nygard has tremendous wealth and power and has used it to retaliate against others who have attempted to come forward, including by means of arson, property destruction, and threats of physical violence.

36.    Plaintiffs are also particularly vulnerable because of the trauma that they have been subjected to, their socioeconomic status, and the corruption of local law enforcement by Nygard through bribery and political influence.[10]

37.    Plaintiffs' safety, right to privacy, and security outweigh the public interest in their identification.

38.    Plaintiffs' legitimate concerns outweigh any prejudice to Defendants by allowing Plaintiffs Jane Does Nos. 1-10 to proceed anonymously.

39.    Jane Doe No. 1 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on March 28, 2001.  In July 2015, Jane Doe No. 1 was vaginally raped by Nygard at the age of fourteen, while attending a "pamper party" at Nygard Cay.  Nygard lured her to his bedroom under false promises of a future modeling contract.  Following the rape, she was paid by Nygard in U.S. currency from the Nygard Companies.  She never returned to Nygard Cay.

40.    Jane Doe No. 2 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on March 14, 1997.  In August and November 2011, Jane Doe No. 2 was vaginally raped by Nygard at the age of fourteen, while attending "pamper parties" at Nygard Cay.  She attended the "pamper parties" and Nygard lured her to his bedroom under false promises of a future modeling contract.  Following the rape, Nygard paid her approximately $5,000 in U.S. currency

---

[10] *See, e.g.*, https://www.youtube.com/watch?v=Pw1xUXQNeIg;
http://www.tribune242.com/news/2018/feb/14/nygard-outright-bribery-plp/;
http://www.tribune242.com/news/2014/jun/25/nygard-gave-money-plp-then-asked-help-over-land-is/; http://www.tribune242.com/news/2017/may/05/fresh-questions-over-las-vegas-trip-pm-gibson-and-/

from the Nygard Companies.  She attended several "pamper parties" at Nygard Cay subsequent to 2011, and Nygard paid her with cash from the Nygard Companies to "recruit" and/or "procure" other young girls for him to commit commercial sex acts with.

41.     Jane Doe No. 3 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on July 25, 1995.  In June 2011, Jane Doe No. 3 was vaginally raped by Nygard at the age of fifteen, while attending a "pamper party" at Nygard Cay.  Jane Doe No. 3 was lured to Nygard Cay under false promises of a job there.   Following the rape, Nygard paid her approximately $200 in U.S. currency from the Nygard Companies.

42.     Jane Doe No. 4 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on February 12, 1997.  In June 2011, Jane Doe No. 4 was vaginally raped by Nygard at the age of fourteen, while attending a "pamper party" at Nygard Cay.  Nygard lured Jane Doe No. 4 to his bedroom under a false promise of a modeling contract.  Following the rape, Nygard paid her approximately $5,600 in U.S. currency from the Nygard Companies.  She never returned to Nygard Cay.

43.     Jane Doe No. 5 is a Bahamian citizen born, in Nassau, New Providence, the Bahamas, on August 7, 1992.  In July 2009, Jane Doe No. 5 was anally raped by Nygard at the age sixteen, while attending a "pamper party" at Nygard Cay.  Following the rape, Nygard paid her approximately $200 in U.S. currency from the Nygard Companies.  She never returned to Nygard Cay.

44.     Jane Doe No. 6 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on August 28, 1992.  In August 2008, Jane Doe No. 6 was vaginally raped by Nygard at the age of fifteen, while attending a "pamper party" at Nygard Cay.  Following the rape, Nygard

offered her cash from the Nygard Companies and she refused it.  She never returned to Nygard Cay.

45.    Jane Doe No. 7 is a Bahamian citizen born on April 13, 1992.  In 2010, Jane Doe No. 7 was anally raped by Nygard at the age of eighteen, while attending a "pamper party" at Nygard Cay.  Following the rape, Nygard paid her approximately $550 in U.S. currency from the Nygard Companies.  She never returned to Nygard Cay.

46.    Jane Doe No. 8 is a Bahamian citizen born on September 12, 1984.  In 2014, Jane Doe. No. 8 was vaginally raped by Nygard at the age of 29 or 30, while serving as an employee at Nygard Cay.  Following the rape, Nygard offered her cash in U.S. currency from the Nygard Companies.  She was terminated from her employment when she refused to continue engaging in sexual relations on an ongoing basis with Nygard.  Between April 6, 2017 and April 10, 2017, Nygard caused Jane Doe No. 8 to be kidnapped and transported to Toronto and Fort Lauderdale.

47.    Jane Doe No. 9 is a United States citizen.  She was an employee of Nygard and the Nygard Companies.  Throughout her time as an employee of Nygard and the Nygard Companies, she was sexually assaulted by Nygard on multiple occasions. In 2015, Nygard forcefully raped Jane Doe No. 9 at his residence in Marina Del Ray, California.  Nygard used her continued employment with and payment by the Nygard Companies as a means to control and coerce Jane Doe No. 9 into commercial sex acts.

48.    Jane Doe No. 10 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on August 19, 1988.  When Jane Doe No. 10 was fifteen years old, she was drugged and raped, both anally and vaginally, by Nygard while attending a "pamper party."  Nygard offered her $5,000 prior to raping her and later offered her $10,000 to defecate in his mouth.

**B.**     **Defendants**

49.     Defendant Peter J. Nygard is a Finnish and Canadian citizen with permanent residences in the United States, including in New York City, Los Angeles, and Florida.  He is the founder, chairman, figurehead, icon, and, directly or indirectly, the 100% owner of the Nygard Companies.

50.     Through the Nygard Companies, as Nygard himself alleged in United States federal court, he "carries on business at various locations around the world as a designer, manufacturer, distributor, and seller of women's clothing and accessories.  Mr. Nygard and his business are closely associated in the public eye."[11]

51.     Nygard regularly travels to the United States, spends substantial time at his residence in this District, and conducts substantial business in this District through his global headquarters and flagship store, which are located in this District.[12]

52.     Defendant Nygard Inc. is a Delaware corporation that distributes women's apparel with its global headquarters in New York City.

53.     Nygard Inc. conducts substantial business in this District and at various other locations in the United States and around the world.

54.     Defendant Nygard International is a Canadian corporation that has its administrative offices in Winnipeg, Canada and its global headquarters in New York City.[13]

---

[11] *See* Complaint at ¶¶ 1, 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

[12] *See https*://vimeo.com/160922029

[13] https://corporate.nygard.com/about-nygard/ ("Along with its corporate headquarters located in the heart of Times Square, the company lays claim to complete design, production and distribution facilities in Los Angeles, Toronto and Winnipeg, superb research and design studios in New York and Shanghai, and sales offices throughout Canada and the U.S."); https://www.linkedin.com/company/nygard-international/about/ ("Along with its new World Headquarters located in the heart of Times Square, the company lays claim to complete design,

55.    Nygard International conducts substantial business in this District and various other locations in the United States and around the world.[14]

56.    Defendant Nygard Holdings is a Bahamian shell corporation registered in the Bahamas.

57.    Nygard uses Nygard Holdings as a depository for funds from Nygard International, from which Nygard pays for his illegal sex trafficking venture.

58.    There is no corporate distinction between or among the Nygard Companies.  At all times relevant herein, Nygard was the sole owner and executive of the Nygard Companies, their funds were commingled, and the companies do not observe any corporate formalities.  Every aspect of the Nygard Companies' business is controlled exclusively by Nygard, and nothing can happen without his express direction or authorization.

59.    Nygard also regularly invokes the jurisdiction of the United States courts, in his personal capacity and through his companies, by regularly filing lawsuits therein.[15]

60.    The Nygard Companies knowingly aided and abetted, facilitated, and directly participated in Nygard's illegal venture by paying for and hosting "pamper parties" under the Nygard brand, withdrawing large sums of cash, paying employees at all such events, allowing use

---

production & distribution facilities in Los Angeles, Toronto & Winnipeg and superb research & design studios worldwide.").

[14] https://corporate.nygard.com/about-nygard/

[15] *See, e.g. Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027, 2017 WL 4303825 (S.D. Fla. Jan. 5, 2017); *Nygard International Partnership v. Feralio*, No. B266683, 2017 WL 4784925 (Cal. Ct. App. Oct. 24, 2017); *Nygard v. Jasper*, No. 8:15-cv-1939-T-33EAJ, 2016 WL 9526666 (M.D. Fla. Jan. 4, 2016); *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027 (Cal. Ct. App. 2008); *Nygard, Inc. v. Kustannusosakeyhtio Iltalehti*, No. B192639, 2007 WL 1775963 (Cal. Ct. App. June 21, 2007).

of the Company-owned "N-Force" jet[16] to transport Nygard's victims from the Bahamas to other destinations in the United States and around the world, allowing use of the company-owned boat to transport liquor, drugs, and supplies for "pamper parties," and paying for Nygard's commercial sex acts with Jane Does Nos. 1-10 and the other Class members, among other actions.

61.    The Nygard Companies also benefit from such activity by using the "pamper parties," Nygard's playboy image, and the Nygard Cay property to promote the Nygard brand and products to consumers in the Bahamas and elsewhere.[17]

62.    Several of Nygard's victims were also coerced into labor trafficking that directly benefited the Nygard Companies.  Those being labor trafficked were forced to work exceptionally long hours with little sleep for no additional payment.  Often, the jobs they were hired to perform would be expanded by Nygard to include countless other duties with no additional pay.

## THE TRAFFICKING VICTIMS PROTECTION ACT

63.    The TVPA outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.  It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

64.    The TVPA makes it unlawful for:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

---

[16] *See* https://corporate.nygard.com/2005/07/15/ilta-sanomat-fashion-moguls-plane-will-house-a-sauna-private-movie-theatre-a-disco/.

[17] *See, e.g.,*  http://www4.nygard.com/SCF/NygardCayBahamas.aspx?ID=38&Folder_id=55 http://www4.nygard.com/scf/News.aspx?id=7826https://www.youtube.com/watch?v=WPFz3_yfj2I; https://www.youtube.com/watch?v=WUzW-Y0qRB0; https://www.youtube.com/watch?v=Dx23m_Op0J0; https://www.youtube.com/watch?v=cwRdiTSY_dM

(2)  benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).[18]

65.     As alleged herein, Defendants have knowingly used interstate and foreign commerce to violate the TVPA by enticing and recruiting Jane Does Nos. 1-10 and the other Class members knowing, or in reckless disregard of the fact, that fraud, threats of serious harm, coercion, and physical force, or knowing that the victim had not attained the age of eighteen years, would cause the victims to engage in commercial sex acts.

66.     The TVPA's civil provision, 18 U.S.C. § 1596, applies extraterritorially to all violations that occurred after December 19, 2003, wherein the alleged offender is a national of the United States; an alien lawfully admitted for permanent residence; or is present in the United States.  The violations against Jane Does Nos. 1, 2, 3, 4, 5, 6, 7, 8,  and 10 occurred in the Bahamas after December 19, 2003, and/or occurred within the territorial jurisdiction of the United States, and the Defendants are lawfully admitted to the United States for permanent residence and/or are present in the United States.

67.     The TVPA also applies to Nygard's conduct abroad because the locus of the Nygard Companies, which supplied resources including cash payments to the victims, is in New York

---

[18] 18 U.S.C. § 1591(a).

City.  Further, Nygard has substantial contacts with the United States, both individually as well as through the Nygard Companies.

68.     The Nygard Companies aided and abetted, facilitated, and directly participated in Nygard's venture through conduct that originated and/or occurred in the United States.

69.     Nygard uses the Nygard Companies' money, brand, and resources to facilitate and commit commercial sex acts in the United States, the Bahamas, and elsewhere around the world. The Nygard Companies fund all of Nygard's "pamper parties" by transferring cash from the company's bank account in Canada and routing it through New York, the Nygard Companies' worldwide headquarters.  All "pamper party" employees and supplies including, without limitation, food, alcohol, drugs, and entertainment, are paid for from a Nygard Holdings account that is funded directly by Nygard International.  And, critically, the cash that Nygard uses to pay his victims after raping and/or sexually assaulting them, comes from the Nygard Companies.

70.     The Nygard Companies have their global headquarters in New York City and have actual knowledge of Nygard's illegal activity through Nygard—the founder, chairman, and 100% owner of the companies at the time of the acts detailed in this Complaint.  Other finance personnel, among others, know or should know about Nygard's illegal activity, because they are routinely sending tens of thousands of dollars per month in U.S. currency, without substantiation or controls, to Nygard.

71.     Nygard has a permanent residence in New York City, which is above his flagship store on 40th Street and Broadway, near Times Square.  The building is leased by Nygard International.

72.     Nygard also has residences in Los Angeles and Florida.

73.     Nygard also owns companies, Nygard NY Retail, LLC, Nygard Partners, LLC, and Orion Asset Management, Inc., each of which is a New York corporation.

74.     Nygard enticed and coerced some of his victims, as alleged herein, to engage in commercial sex acts in, among other places, Los Angeles and New York City.

75.     Nygard uses his "N-Force" jet to transport his victims from the Bahamas to his residences in New York, California, and Florida, as well as elsewhere around the world.

76.     Nygard uses the Nygard Companies-owned boats, which are docked in Florida for months at a time, to transport drugs, liquor, and supplies for "pamper parties."

77.     Nygard also uses the Nygard Companies' resources, including, without limitation, the "N-Force" jet and boats, to smuggle women, drugs, liquor, and other supplies into and out of various jurisdictions including, without limitation, the United States and the Bahamas.

78.     Nygard uses employees paid by the Nygard Companies, who use Company phones, computers, email, and social media accounts to entice and lure his victims to locations in the United States, the Bahamas, and Canada, so that Nygard can use fraud and coercion to force them, or, knowing that the victim has not attained the age of eighteen years, to engage in commercial sex acts.  He also keeps a database of potential victims that is maintained by the corporate IT department on the Nygard Companies' corporate server.

79.     Given these substantial and systematic contacts between the United States and Nygard's misconduct in the United States, the Bahamas, and elsewhere, it is neither arbitrary nor unfair to exercise application of the TVPA for Defendants' activities that partially occurred in the Bahamas and elsewhere around the world.

80.     Application of the TVPA is also consistent with international law by virtue of the Palermo Protocols, which are three protocols adopted by the United Nations to supplement the

2000 Convention against transnational organized crime, including the Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children.

## FACTUAL ALLEGATIONS

**A.  Peter J. Nygard is Synonymous with the Nygard Companies.**

81.     Defendant Peter J. Nygard is a renowned fashion figure and executive in the women's apparel industry.  He has an estimated net worth of approximately $900 million through various business entities that he owns in the fashion industry.[19]

82.     Defendant Nygard Inc. is a Delaware corporation that distributes women's apparel with its global headquarters in New York City, New York.

83.     Defendant Nygard International is a Canadian corporation that is one of the largest women's clothing manufacturers and suppliers in the world, with annual sales exceeding $500 million.  Nygard International has its administrative offices in Winnipeg, Canada and its global headquarters in New York City.[20]



---

[19] https://www.youtube.com/watch?v=yH0ODUKH1qE; https://www.youtube.com/watch?v=L1x-Vrn-33M; https://www.youtube.com/watch?v=iK5hlWl5qLc

[20] https://corporate.nygard.com/about-nygard/

84.     Defendant Nygard Holdings is a Bahamian shell corporation registered in the Bahamas.  It does not engage in active business or trading activities.

85.     Nygard uses Nygard Holdings as a depository for funds, routed through New York, from Nygard International, from which Nygard pays for his illegal sex trafficking venture.

86.     Nygard is the founder, chairman, figurehead, icon, and was, directly or indirectly, the 100% owner of the Nygard Companies at the time of the events described in this Complaint.[21] He controls every aspect of the Nygard Companies' business, and nothing can be done without his express authorization or direction.  Nygard commingles the Nygard Companies' funds, uses the Nygard Companies as his own personal bank account, and does not observe any corporate formalities.

87.     Nygard admits in public filings that he and his businesses are "closely associated in the public eye."[22]

88.     The Nygard Companies' promotional materials and advertisements also make the companies synonymous with "one man," Nygard, who is featured individually on almost all promotional materials and advertisements.[23]



---

[21] *See* Complaint at ¶ 1, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

[22] *Id.* at ¶¶ 1, 31.

[23] *See, e.g.*, video at https://corporate.nygard.com/

89.     In addition, Nygard and his businesses are "closely identified in the public mind, similar to other fashion houses," as illustrated by the corporate billboard in the heart of Times Square.[24]



90.     The Nygard Companies have also trademarked the name "Peter J. Nygard."

91.     The Nygard Companies' promotional materials prominently feature his Nygard Cay property (he even named the property after himself and the company).[25]   The Nygard brand and logo is also featured prominently at Nygard Cay, and all events hosted at Nygard Cay are the Nygard Companies' corporate functions.[26]

---

[24] *See* Complaint at ¶ 31, *Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027 (S.D. Fla. Jan. 5, 2017).

[25] *See* https://www.youtube.com/watch?v=GQRDS-KlOw0; *https*://vimeo.com/160922029

[26] *See* http://pimpingpictures.com/Jarmopohjaniemi.com/Blog/Entries/2008/6/11_Nygard_Cay_Hosts_Playboy_Shoot.html

92.     Nygard and the Nygard Companies also use the Nygard Cay property to promote the Nygard Companies' brand by renting it out and having events and parties with celebrities and politicians including, among others, Oprah Winfrey, George H.W. Bush, Robert De Niro, and Sean Connery.[27]



93.     Nygard uses the Nygard Cay property, his customized "N-Force" jet, his boat, and his New York City apartment above his flagship store—each of which is owned or leased by the Nygard Companies or companies affiliated with the Nygard Companies—to promote himself and the Nygard Companies and, at the same time, facilitate the commission of his crimes, as noted throughout this Complaint.

---

[27] *See* https://www.lawcrossing.com/article/3372/Indulge-in-the-Pleasures-of-Nygard-Cay/; *see also* https://corporate.nygard.com/2006/12/09/nygards-cay-an-island-of-fantasy-the-ultimate-treehouse/



94.     Nygard hosts "pamper parties,"[28] under the Nygard brand, as a means to further his illegal venture and also benefit the brand of the Nygard Companies.[29]  The "pamper parties" and all supplies—including alcohol and drugs provided to minors—are paid for by the Nygard Companies.

95.     Employees that staff the "pamper parties" are also paid by the Nygard Companies with funds routed through New York City.

96.     In addition to staffing the parties with bartenders, cooks, servers, maids, and other employees, the Nygard Companies also employ people to work at what Nygard refers to as ComCor, who are used to ensure that potential victims attend the "pamper parties" by contacting them and arranging for transportation.

---

[28] *See* https://www.youtube.com/watch?v=WPFz3_yfj2I

[29] *See* http://pimpingpictures.com/Jarmopohjaniemi.com/Blog/Entries/2008/6/11_Nygard_Cay_Hosts_Playboy_Shoot.html

97.     The Nygard Companies' ComCor employees also recruit and/or procure potential victims for Nygard.  ComCor employees are paid by the Nygard Companies.

98.     When girls would be flown into the Bahamas on the "N-Force" jet for "pamper parties," the passengers would have their passports collected, their return flight was cancelled by the travel agency personnel, and approval from Nygard was required to leave Nygard Cay and the island.  Nygard expected a sex act before he was willing to consider releasing any person.

99.     Once Nygard selects his victim for the night, his employees are sometimes instructed to drug the victims, by placing Rohypnol and/or other mind-altering drugs in their drinks (referred to as "happy juice," or "cocktails"), and to escort the victims to Nygard's bedroom.

100.    Nygard uses the "pamper parties" to both promote the Nygard Companies' brand and to facilitate commercial sex acts.  He is acting on behalf of the Nygard Companies, under the brand and reputation of the companies, and using funds of the companies to commit his crimes.

101.    Nygard, Nygard, Inc., and Nygard International have invoked the jurisdiction of the United States courts by filing lawsuits in the United States courts, as well as being "synonymous" with Nygard Inc. and using Nygard Inc. to participate in his criminal venture for both his own benefit and the benefit of the Nygard Companies.[30]

---

[30] *See, e.g. Nygard, et al. v. Dipaolo, et al.*, No. 17-cv-60027, 2017 WL 4303825 (S.D. Fla. Jan. 5, 2017); *Nygard International Partnership v. Feralio*, No. B266683, 2017 WL 4784925 (Cal. Ct. App. Oct. 24, 2017); *Nygard v. Jasper*, No. 8:15-cv-1939-T-33EAJ, 2016 WL 9526666 (M.D. Fla. Jan. 4, 2016); *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027 (Cal. Ct. App. 2008); *Nygard, Inc. v. Kustannusosakeyhtio Iltalehti*, No. B192639, 2007 WL 1775963 (Cal. Ct. App. June 21, 2007).

**B.    Nygard is Able to Engage in A Uniform Pattern and Practice of Sex Trafficking Due, in Part, to Bahamian Culture, Political Corruption, and His Power in the Bahamas.**

**1.    Sexual Crimes are Drastically Under-Reported in the Bahamas Due to Weak Laws that are Poorly Enforced.**

102.    In 2007, the Bahamas had the highest rate of reported rapes in the world, and, in 2016, it had the highest incidence of rape per capita in the Caribbean.  The UN Woman narrative on gender-based violence in the Caribbean found that the worldwide average for rape was fifteen per 100,000, while the Bahamas has an average of *133* per 100,000.[31]

103.    Global estimates are that between 60 and 95 percent of sexual crimes go unreported and that even those reported are unlikely to be prosecuted.  Rape in particular is the most underreported violent crime.[32]

104.    Rape is particularly underreported in the Bahamas due to a culture of stigmatization, victim shaming, government corruption, and weakly-enforced laws.  For example, in 2013, the Bahamas Crisis Centre in New Providence alone counselled 122 new clients for rape and 42 for sexual assault, while, during that same period, the police recorded only 104 rapes for the entire country.  During the same time period, data from Princess Margaret Hospital's emergency room alone shows it treated nearly 1.5 times the amount of country-wide rapes reported to the police.[33]

---

[31] http://www.unodc.org/pdf/research/Cr_and_Vio_Car_E.pdf;
http://www.tribune242.com/news/2016/feb/16/bahamas-has-worst-total-region-rapes/.

[32] Heather Sutton, IDB Series on Crime and Violence in the Caribbean: Crime and Violence in the Bahamas, June 2016, at 34-25, available at
https://publications.iadb.org/en/publication/12508/crime-and-violence-bahamas-idb-series-crime-and-violence-caribbean.

[33] *Id.*; https://ewnews.com/711-rapes-presented-to-hospitals-since-july-2013

105.    The local word for rape in the Bahamas is "hush."  It is not discussed or spoken of as a societal problem.

106.    In 2018, the State Department issued a travel advisory warning that "sexual assault is common" in the Bahamas and advising tourists to exercise caution.

107.    Rapes in the Bahamas also have very low police-clearance rates.  On average, the percentage of rape cases solved between 2010 and 2013 was 40 percent.  This means that rapes are highly unlikely to be prosecuted, which does little to stimulate better reporting.[34]

108.    Another reason why sex crimes are so widely under-investigated and prosecuted in the Bahamas is because violence against women and girls is often seen as a private matter, in which the State should not interfere.  A culture of acceptance interrelated with strong patriarchal gender norms is prevalent, which can lead to failures in response by law enforcement.[35]

109.    Due, in part, to these factors, scores of Nygard rapes and sexual assaults in the Bahamas have gone unreported over the past three decades.

**2.    Political and Government Corruption Has Been Widespread in the Bahamas.**

110.    Political and governmental corruption is "rooted in the fabric of Bahamian society."[36]  The government has laws to combat corruption of and by public officials, but they are inconsistently applied.[37]

111.    According to one survey, despite one in ten Bahamians disclosing that they had been forced to pay a bribe within the past year to obtain public services, few reported the corruption

---

[34] *Id.*

[35] Human Rights Council, Report of the Special Rapporteur on violence against women, its causes and consequences, on her mission to the Bahamas, at 4 (May 25, 2018), available at https://undocs.org/en/A/HRC/38/47/Add.2.

[36] http://www.tribune242.com/news/2018/apr/26/not-a-single-bribe-demand-is-probed/

[37] https://www.globalsecurity.org/military/world/caribbean/bs-corruption.htm

to law enforcement.  According to the survey, almost half were too scared of the consequences—such as potential retaliation and victimization—to report allegations of bribery by public officials. Fear is a major obstacle to stamping out a problem that the Bahamian Prime Minister recently estimated costs the Bahamian economy approximately $200 million per year.[38]

112.    For this reason, few people in the Bahamas (approximately 6%) actually report corruption when they experience it.  Overwhelmingly, the survey showed that of those who reported an incident of corruption to the authorities—***not one*** respondent stated that the authorities took action against the government officials involved.  This is despite the evidence showing that one in eight Bahamians (approximately 13%) who had contact with the police in the year prior to October 2017 had paid a bribe in order to get services they needed.[39]

113.    Bribery in the courts was also reported, with one in ten people who came into contact with the courts having paid a bribe in the previous twelve months, demonstrating that there is still an acute corruption risk in this key law and order institution (10%).  The findings indicate how corruption is undermining the rule of law and public safety in the Bahamas, in addition to the Bahamians' inability to police its borders and determine who can reside in the country.[40] Corruption has become "a cultural element of the mindset of Bahamians[,]" and "[i]t's rooted in the fabric of society."[41]

114.    Additionally, the Royal Bahamas Police Force scored an unwanted first by becoming the first police organization in the Caribbean to rank top for both receiving bribery payments and being perceived as the country's most corrupt public institution.  As a result,

---

[38] http://www.tribune242.com/news/2018/apr/26/not-a-single-bribe-demand-is-probed/

[39] *Id.*

[40] *Id.*

[41] *Id.*

Bahamians are unwilling to report corruption and other crimes to law enforcement because they don't trust the police.[42]

115.     Due to the low police clearance rates for investigations of sexual crimes and the cultural attitude toward sexual crimes and the victims of such crimes, victims of sexual crimes in the Bahamas rarely pursue their claims.  They are ashamed and embarrassed, fear retaliation and victimization, rightfully do not trust law enforcement to pursue and prosecute their attackers, and do not trust the court system to provide them with justice.

### 3.     Nygard has Significant Power and Influence in the Bahamas, Resulting from His Chronic Bribery and Bahamian Political Contributions.

116.     During the time-period relevant to this action, Nygard was well known in the Bahamas as one of the wealthiest and most influential individuals with a home there.[43]  He has also spent significant money to bribe Bahamian officials including, without limitation, law enforcement, and to gain political influence and power on the island through political contributions.[44]

117.     Nygard made significant financial contributions and efforts in order to help the Progressive Liberal Party ("PLP") and its leader, Perry Christie ("Christie") (the former Bahamian Prime Minister from 2002-2007 and 2012-2017), gain power in the Bahamas by winning the 2012 election.[45]

---

[42] *Id.*

[43] *See, e.g.*, https://www.youtube.com/watch?v=n6KOtR4G37U; https://www.youtube.com/watch?v=d55fJKf8zsA

[44] *See, e.g.*, https://www.youtube.com/watch?v=zKFjnnHXDGs; https://www.youtube.com/watch?v=ih55gjHvEp8

[45] *See* http://www.tribune242.com/news/2013/jul/18/mp-concerns-nygard-donated-5m-plp/; http://www.tribune242.com/news/2013/jul/23/nygard-admits-backing-plp-sworn-affidavit/

118.    Nygard contributed at least $10 million (in U.S. or Bahamian currency) to get Christie elected and paid to have individuals spread bad press about the party in power at the time, the Free National Movement party ("FNM").  He also paid $300 to each person who would vote for the PLP in the 2012 election.  Nygard was thus able to successfully help Christie get elected, in exchange for political favors and influence.

119.    Nygard and Christie were in regular contact with one another before, during, and after the 2012 election.[46]  Nygard regularly invited political figures, such as Bahamian Parliament members including, without limitation, Shane Gibson and police officers, to attend his "pamper parties."  The photograph below shows Shane Gibson at a "pamper party" in 2014.



Mr. S Gibson ;-) ;-)

Upload IP       65.75.69.75
Address

Dec 1, 2014, 5:57 PM

---

[46] *See, e.g.*, http://www.tribune242.com/news/2017/may/05/fresh-questions-over-las-vegas-trip-pm-gibson-and-/

120.    Nygard also provided PLP party members, including Shane Gibson and corrupt police officers, with children and young women to engage in commercial sex acts with.  Nygard did so to gain influence with these politicians and law enforcement officials, as well as to gain compromising information about them in order to exert his influence over them.



121.    On September 5, 2012, shortly after the 2012 election, Prime Minister Christie and other high-ranking members of the PLP visited Nygard at Nygard Cay.



122.    Nygard also hosted high-ranking PLP officials at his Nygard Cay property to celebrate the PLP election victory in 2012, including the following, without limitation:   the Minister of Housing & National Insurance, Shane Gibson; the Minister for Grand Bahamas, Dr. Michael Darville; the Minister of Education, Jerome Gomez; the Minister of Agriculture, Alfred Gray; the Minister of Housing & Environment, Ken Dorsett; the Minister of Health, Dr. Perry Gomez; and the Director of Fertility, Dr. Wan Song.[47]



123.    Bahamian Parliament member and PLP member, Shane Gibson, was paid approximately $94,131.10 prior to the general election in 2012 and into 2013.  The funds were deposited directly to his account, and the payments were made with funds from the Nygard Companies.

---

[47] *See* https://www.youtube.com/watch?v=Pw1xUXQNelg; *see also* https://www.youtube.com/watch?v=jVfw9LOSOZo



124.   Eric Gibson, who is Shane Gibson's brother, was also on Nygard's payroll and was paid directly by the Nygard Companies.  It was known by Nygard's ComCor employees to have a check ready for Eric Gibson every week, but they did not know what work that he provided for Nygard.  Pat Smith, a PLP loyalist with connections to Perry Christie, was also provided with payments from the Nygard Companies.









  



125.    Nygard was also close with Deputy Prime Minister Phillip "Brave" Davis ("Davis") and regularly met with him and paid bribes to him and his political aides.

126.    Davis allegedly introduced Nygard to known Bahamian gangsters and convicted criminals, Livingston "Toogie" Bullard and Wisler "Bobo" Davilma.[48]  Nygard paid "Toogie" and "Bobo" with funds from the Nygard Companies to intimidate anyone who spoke out against him or his initiatives by, among other means, directing them to firebomb his detractors' vehicles and/or businesses, instructing them to threaten to kill those who oppose him, and commit other acts of violence and intimidation.[49]

127.    Nygard used his political connections and bribes to successfully gain building permits and to receive other favorable treatment including, without limitation, overlooking his illegal activities.

128.    Nygard had Bahamian police officers on his "payroll."  He used them to help "bury" any reports of sexual abuse and intimidate, threaten to arrest, and otherwise harass his victims to ensure that they would not come forward.   Nygard often alludes to the fact, in front of his

---

[48] *See* https://www.bahamaslocal.com/newsitem/147536/Court_documents_claim_Deputy_PM_sent_criminals_to_protect_Nygards_interests.html; https://www.youtube.com/watch?v=xCa9LEJsg2I (Nygard berating his security guard, Leo Thurston).

[49] *See* http://www.tribune242.com/news/2016/mar/10/claim-nygard-hired-hitmen/

"girlfriends," that he is powerful enough in the Bahamas to have people killed without being investigated.

129.    Indeed, when Nygard learned of the investigation of his illegal sex trafficking, he engaged lawyers to facilitate bribery payments to top Bahamian police officials to get more information that would enable him to attempt to bribe victims or intimidate them into silence.

130.    Nygard also regularly bribes Bahamian officials with U.S. currency from the Nygard Companies to prevent customs from searching his plane, prevent customs from checking the passports of the young women onboard, and to prevent customs from inspecting the passengers' luggage.  This allows Nygard to traffic his victims to and from the Bahamas, transport drugs intended for his victims, and transport other supplies for "pamper parties" in the Nygard Companies' plane to avoid paying customs.

131.    Nygard does the same with the Nygard Companies' boats and regularly transports supplies and victims for his "pamper parties" from Florida to the Bahamas.

132.    Nygard's victims have been previously unable to come forward to report his illegal activity and pursue their claims against him for several reasons including, without limitation, cultural stigmatization, shame, weak laws that are rarely enforced, low clearance rates for sexual-assault investigations, corrupt law enforcement and government officials, fear of Nygard's wealth, power, and influence in the Bahamas, and psychological manipulation and intimidation tactics used by Nygard, including the commonly held belief that Nygard has bribed government officials and the police.

**C.    Nygard Engages in a Uniform Pattern and Practice of Sex Trafficking, Using the Nygard Companies' Resources and Brand, for the Benefit of Himself and the Nygard Companies.**

133.    Nygard engages in a uniform pattern and practice to recruit, lure, and entice children and women, knowing, or in reckless disregard of the fact, that means of force, fraud, and coercion, or that the child had not yet attained the age of eighteen years, to cause the victims to engage in a commercial sex act.  Methods employed by Nygard to commit sex trafficking include, but are not limited to, the use of physical force, threatening physical force, drugging victims, promising lucrative modeling opportunities, providing money, confiscating his victim's passports, and preventing exit from the Nygard Cay property.

134.    Nygard has targeted, and instructed his employees and associates to target, children. Nygard primarily preys on young, vulnerable, and impoverished Bahamian girls because he knows that they will not report his crimes to law enforcement, particularly in a climate where it is well known that Nygard bribes government and police officials.

135.    Among other deviant acts, Nygard often sodomizes his victims and asks them to defecate on him, including in his mouth.  He also requests that his victims urinate on him and demands that victims on their menstrual periods provide him their menstrual blood for eating.

136.    Due to the extreme deviant nature of Nygard's sexual conduct, his victims feel even more degraded, ashamed, and embarrassed than the typical sexual assault victim.

**1.    Nygard Uses His Nygard Cay Property to Further the Nygard Brand and Facilitate His Illegal Conduct.**

137.    In 1987, Nygard built a 150,000 square-foot compound on Lyford Cay in the Bahamas, which became known as "Nygard Cay."  Nygard uses the property to host company "pamper parties" to promote the Nygard brand and facilitate his sex trafficking.  Nygard Cay is

registered in the name of Peter Nygard and is used to promote the Nygard Companies brand and all construction or maintenance that occurs on the property is paid for by the Nygard Companies.

138.    Lyford Cay is a wealthy, gated community in the Bahamas.  Upon entering Lyford Cay, there is a large security gate stationed with security personnel.  Only those with permission may enter Lyford Cay.  Not even police have the power to enter upon their own discretion.

139.    Once entrance to Lyford Cay is granted, there is an additional fortress-like gate surrounding the Nygard Cay property.  Next to the gate and surrounding the entire property is a fence equipped with barbed wire.



140.    At the gate, there is a gate house with an office attached to it.  The protocol for most "pamper party" guests who enter Nygard Cay is that they must "register" with ComCor by completing a form requesting personal information and taking a headshot and a full-body shot, which is then added to ComCor database.

141.    Once they enter the property, no one at Nygard Cay is allowed to leave the property without Nygard's express permission.  The security gate staff will not open the gate, unless they are instructed to do so by Nygard himself.  The walls of Nygard Cay are tall, equipped with barbed wire, and surround the entire property.  The only way out, other than the main gate, is to swim through shark-infested waters.



**2.    Nygard Hosts Company "Pamper Parties" to Further the Nygard Brand and Facilitate His Illegal Conduct.**

142.    Nygard uses fraud and deceit to knowingly recruit, lure, and entice children and women to his Nygard Cay property under the false pretense of attending weekly company modeling events known as "pamper parties" and promising, among other things, interviews for lucrative modeling opportunities when, in fact, he has no intention of fulfilling his empty promises.

143.    "Pamper parties" are held out by Nygard and the Nygard Companies as modeling events that are sponsored by the Nygard Companies.

144.    On the surface, young girls and women are invited to enjoy the amenities of Nygard Cay and are pampered for the day with free photo shoots, manicures, pedicures, and massages. These parties are intended, in part, to promote the Nygard brand and its products.  They are

promoted on the Nygard Companies' website and through corporate social media accounts. Females from the United States, the Bahamas, Jamaica, and elsewhere regularly attend "pamper parties."

145.   Nygard also uses these "pamper parties" to facilitate his sex-trafficking ring.  The atmosphere at the "pamper parties" is intended to impress vulnerable and impoverished children and young women, so that he can lure and entice his victims onto the Nygard Cay property with promises of modeling contracts and coerce and force them, or knowing that they had not attained the age of eighteen years, to engage in commercial sex acts.

146.    Nygard regularly hosted "pamper parties" at Nygard Cay on Sundays when he was in the Bahamas with the hidden purpose of facilitating his crimes.

147.   Nygard also hosted "pamper parties" at his California property, located at Marina Del Rey.

148.   Generally, only females are permitted to attend the "pamper parties," and all attendees must be on a special list kept by Nygard's ComCor.  An example of correspondence with ComCor follows:

**Bahamas ComCor**

yes only female guest

Jan 12, 2014, 2:18 AM

**Chaniqua Dee**

Im sorry I didn't know its only fenale invites. ..

Jan 12, 2014, 1:07 AM

149.    Only females that meet Nygard's sexual specifications of being slim bodied and beautiful are on the list.  Nygard has also described the females he desires as an "eight in the face and nice toilet."  Other girls that do not meet this qualification are turned away at the security gate.

150.    Another example of ComCor correspondence follows:

| Bahamas ComCor | Candea Taleish Darville |
|---|---|
|  | Pardon |
| yes definitely lol i have been screening real hard on the list | Mar 26, 2015, 2:26 PM |
| Dec 10, 2014, 4:37 PM | Bahamas ComCor |
|  | Boned * |
|  | Mar 26, 2015, 2:10 PM |
| Bianca Bickle Nygård | Bahamas ComCor |
| lets try to make sure the guest list is very slim this sunday ok | I have a question that I hate aasking but I have to. ...are your guest same size as you or smaller? They won't be let in if they are big bonded |
| Dec 10, 2014, 4:36 PM | Mar 26, 2015, 2:09 PM |

151.    Upon arrival at the gated Nygard Cay property, each of the potential victims is required to "register" with the Nygard Companies' ComCor, which is in charge of planning and coordinating corporate events, by providing their personal information, including their name, phone number, email address, and the identity of the person who invited them.  Potential victims are also required to pose for a headshot and a full-body photograph.  The pictures and registration forms are scanned and emailed directly to Nygard, using the Nygard Companies' resources, so that he can review who is in attendance from his bedroom.

152.    The information is then entered into a database so that Nygard has a ready list of "prospective recruits," *i.e.*, potential victims to pursue at any given time.  The database contains

information and pictures of more than 7,500 girls, dating back to 1987.  The database is hosted on a corporate server and is maintained by the Nygard corporate IT department.

153.    The most knowledgeable person about Nygard's IT, Daane Clifford, recently died at the age of 44.  His family described it as a "sudden passing."  No further explanation or cause of death has been forthcoming.

154.    The Nygard Companies' ComCor is used to keep track of, make contact with, and recruit, lure, and entice potential victims to Nygard Cay through the database.

155.    Nygard instructs these company-paid employees to call potential victims to invite them to "pamper parties," transport girls to and from the "pamper parties," or to otherwise pay for their transportation.

156.    Nygard's ComCor also uses social media to post about "pamper parties" and direct messages to potential victims that meet Nygard's specifications to invite to "pamper parties."   The Nygard Companies' Comcor recruits these victims for Nygard and are paid by the Nygard Companies, with funds routinely routed through New York.

157.    Nygard's employees and "girlfriends" are also required to contact potential victims in the database.



158.   Nygard instructs his corporate ComCor to lure and entice potential victims to "pamper parties" by implying that potential modeling opportunities for the Nygard Companies are available:



159.   The sole purpose for contacting these young women and children, however, is to ensure that Nygard has a sufficient pool of victims for the night.   Examples of ComCor communications follow:

**Bahamas ComCor**

All a dem een k Wan fuck

Jan 30, 2015, 6:38 PM

**Mona Brown**

that ein too much pussy for one night? :o

Jan 30, 2015, 6:37 PM

**Bahamas ComCor**

Everyone he's interested in he's slept with before and they can't make it..for sure I am really trying to get precious to come but she stay saying she workin

Jan 30, 2015, 6:16 PM

**Mona Brown**

i remember her..but i dont remember PJN being interested in her

Jan 30, 2015, 6:15 PM

160.    Nygard also coerces his other employees and "girlfriends" to recruit young females to attend the "pamper parties."  All of the Nygard Companies' employees in the Bahamas are required to "recruit" new victims for him.  If they fail to provide an adequate pool of easily exploitable victims, Nygard punishes them by forcing them to engage in sex acts with him, verbally berating them,[50] inflicting psychological abuse, docking pay, and/or forcing them to do manual labor.

161.    In stark contrast, those who provide Nygard with victims are paid extra by the Nygard Companies, and they are able to avoid his wrath and sometimes avoid being his sexual victim.  Nygard's employees and "girlfriends" "recruit" his victims to avoid these punishments and to get into his good graces so they can avoid further victimization and receive rewards.

---

[50] *See, e.g.*, https://www.youtube.com/watch?v=xCa9LEJsg2I (Nygard berating security guard, Leo Thurston); https://www.forbes.com/forbes/2010/1206/features-peter-nygard-sexual-harassment-answers-to-no-one.html#236f0e30bc9b

162.    Once Nygard's potential victims enter the Nygard Cay property, the gates are locked and patrolled by security at all times.  No one is allowed to leave the Nygard Cay property without express permission from Nygard.

163.    Nygard has a preference for young girls and prefers underaged victims.  After he selects his victims for the night, Nygard, either himself or through his groomers, encourages the children and young women to drink wine, "happy juice," or other alcoholic beverages.

164.    If the young girls or women are resistant, he sometimes has his bartenders lace the victims' drinks with drugs such as Rohypnol—colloquially referred to as the "date rape drug" or "roofies."

165.    Nygard then lures the victims to his bedroom or has them ushered there by groomers, under the false pretense of discussing a potential modeling contract in private, where he uses physical force or coercion or knowing the victim has not attained the age of eighteen years, to engage in commercial sex acts, and coerce and force them to engage in other unwanted sexual acts, including the following:  Coprophilia, which is sexual pleasure in feces and defecation; Urolagnia, which is sexual pleasure from the sight or thought of urination; and Menophilia, which is sexual pleasure in a women's menstrual cycle and period blood.

166.    Nygard's personal security guard often stands outside the door to his bedroom, so that nobody can enter and so that his victims cannot leave.

167.    After each encounter, the victim cannot leave without Nygard's personal permission, further extending the victim's horror and humiliation.

168.    Nygard Companies' employees will often arrange for transportation to drive victims away from the property.

169.    Nygard rates his victims based upon their looks and their sexual performance and enters those ratings in his victim database for future reference.

170.    Nygard pays the victims almost exclusively in the Nygard Companies' United States currency, based upon his ratings of the victims and the type of sex acts they were subjected to performing.

171.    The amounts of money provided to the victims is more than most of his victims have seen at one time in their entire lifetimes.

172.     In addition to United States currency, Nygard promises that this money is just a start to what he can provide for the victims.  He promises many victims that he will contact them about future modeling contracts.

173.    However, in the vast majority of cases, Nygard never intends to follow through with the modeling contracts and tells his victims this for the sole purpose of maintaining control over them.

174.    If he does provide any modeling opportunities, it is for the purpose of compelling additional commercial sex acts.

175.    Nygard also threatens the victims with implied or express threats of retribution if they tell anyone about what happened, often implying or expressly threatening to have his victims killed if they do not cooperate.

176.    Nygard typically does not knowingly target the same victims more than once.

177.    For those victims that Nygard does attempt to contact again, however, it is only to engage in additional commercial sex acts.  Nygard, through company employees paid by the Nygard Companies, contacts those victims whom he gave "high ratings" and attempts to get them to attend future pamper parties.  He uses a combination of his wealth, influence, power, and the

victims' socioeconomic vulnerabilities to turn the victims into his full-time sex workers. Nygard's full-time sex workers are forced to act as his personal servants, satisfy his demands for sex acts, and "recruit" new victims for him to engage in commercial sex acts with.

> **3.    Nygard Sex Traffics His "Girlfriends" and Forces Them to "Recruit" New Victims Using Company Resources for the Benefit of Nygard and the Nygard Companies.**

178.    Nygard refers to his full-time sex workers as his "girlfriends" and his entourage of "girlfriends" that live with him at any given time as his "harem."

179.    Nygard's "harem" consists of women from the United States, Canada, Bahamas, and other countries. Some of his "girlfriends" are Bahamian victims who become his "girlfriends" after first being raped at "pamper parties," typically as children as young as fourteen years old.

180.    Nygard typically keeps three to four full-time sex workers with him at all times. They stay with him and are forced to accompany him on trips or "tours" around the world on the Nygard Companies' owned "N-Force" jet,[51] including to California, New Orleans, New York, Toronto, London, Germany, Italy, and China.

181.    Nygard keeps tight and coercive control over his "girlfriends" through a variety of direct and indirect manipulation tactics, including threats of force, physical intimidation and abuse, verbal abuse, forced labor, withholding payment, and confiscating travel documents.

182.    Although Nygard continues to force and coerce his "girlfriends" to engage in commercial sex acts to satisfy his demands for sex, Nygard also uses his "harem" of "girlfriends" to "recruit" or procure new victims for him to engage in commercial sex acts with each night.

---

[51] https://corporate.nygard.com/2005/07/15/ilta-sanomat-fashion-moguls-plane-will-house-a-sauna-private-movie-theatre-a-disco/

183.    Nygard refers to his newly recruited victims as "fresh meat" or "sacrifices." Nygard has an expressed desire for children and tells his "girlfriends," who "recruit" for him, "the younger the better."

184.    Nygard fully expects his "girlfriends" to "loosen up" his victims by giving them alcohol laced with drugs, including mind-altering drugs.

185.    If his "girlfriends" fail to provide Nygard with an easily exploitable victim each night, Nygard punishes them by verbally berating them, inflicting psychological abuse, withholding or cutting pay, forcing them to do manual labor, and forcing them to satisfy his perverse sexual desires.

186.    However, those who provide him with victims are paid extra for each victim and are also able to avoid his wrath.

187.    Nygard's "girlfriends" "recruit" his victims to avoid these punishments and to get into his good graces, so they can receive rewards including, without limitation, any payments that Nygard may be withholding.  Nygard's "girlfriends" also do so because they know that if they are able to "recruit" a new victim for Nygard, they will not be forced to satisfy his perverse sexual fetishes.  Nygard's "girlfriends" have "recruited" victims to engage in commercial sex acts with Nygard in, among other places, the Bahamas, Miami, Texas, New York, Los Angeles, Canada, China, and Germany.

188.    Travel arrangements for Nygard's "girlfriends" are made through Nygard's corporate travel department.  While on trips, Nygard's "girlfriends" are particularly vulnerable because they are in unfamiliar countries, entirely dependent upon Nygard for money, and he confiscates their travel documents.

189.    Nygard threatens to desert those of his "girlfriends" that do not follow his orders in foreign countries with no money or travel documents.  Those who refuse his orders are left behind broke and destitute.

190.    Initially, Nygard's "girlfriends" are led to believe that they are traveling with him as models on glamorous fashion tours.  Eventually, they learn that they are nothing more than full-time sex workers to Nygard that are forced to cater to all of his personal needs, including his demands for sex acts.

191.    Nygard frequently takes his "girlfriends" to his New York City apartment, which is located near Times Square and is leased by the Nygard Companies.

192.    Nygard also regularly forces his "girlfriends" to accompany him to "swingers" clubs in New York City.  While at the "swingers" clubs, Nygard forces his "girlfriends" to find couples for him to have sex with.  He then pays and/or coerces his "girlfriends" to have sex with other men, while he watches and engages in sex with the man's partner.

193.    While on official Nygard Companies' "tours," Nygard coerces his "girlfriends" to engage in forced labor for the benefit of the companies.  Nygard's "girlfriends" are forced to be at his beck and call and to cater to his every need 24 hours per day, 7 days per week.  They must awake every day at 5:30 a.m. to prepare his breakfast and ensure that it is ready for him to eat the moment he awakens.  They are also required to, among other things, give him his medications on schedule, prepare his clothes, bathe him, clip his toenails, and prepare all of his meals.

194.    The "girlfriends" are also required to prepare his bags with marketing and public relations materials for his business meetings relating to the Nygard Companies, attend his business meetings, otherwise act as his personal servants, and to model company clothing for company executives—all of which directly benefit the Nygard Companies.

195.    The "girlfriends" are expected to constantly go out and buy the tools of Nygard's trade: condoms, lubricant, and the Plan B abortion pill.

196.    Nygard's "girlfriends" are always paid varying amounts of cash in United States currency from the Nygard Companies, directly by Nygard, to buy their compliance and silence.

197.    Nygard's longtime "girlfriends" are also put on the official "girlfriend" or "model" company payroll.  They are paid monthly through direct deposit with funds from a Nygard corporate account by the Nygard corporate accountant, Lili Micic.  They are required to submit invoices that state that they are being paid for "modeling and promotional services"—even though they are full-time sex workers.  These payments are made "per Mr. Nygard's request."



198.    Every payment from the Nygard Companies has to be directly approved by Nygard himself.  The amount of payment is entirely conditioned upon their level of servitude to Nygard,

their ability to satisfy his sexual desires, and their ability to recruit new victims for him to engage in commercial sex acts with.

199.    Nygard uses his financial resources, influence, power in the Bahamas, and psychological manipulation to intimidate his victims and ensure that his crimes are not reported.

200.    Those of his "girlfriends" who try to leave him are harassed and threatened by Bahamian police that are on Nygard's payroll.

201.    Nygard has also paid people, using Nygard Companies' cash, to intimidate his former "girlfriends" by slashing their tires, committing arson, threatening to arrest them, and by having them followed.

**4.      Nygard Intentionally Uses Fraud, Coercion, and Force to Cause and Bring About Commercial Sex Acts with His Victims Through the Nygard Companies' Resources.**

202.    Nygard's use of fraud, coercion, and force were "used to cause," or designed to bring about, the illegal sex acts.

203.    Nygard intended and was aware that the fraud, coercion, and force would cause commercial sex acts to take place with his victims.

204.    Nygard's goal, as evidenced by his uniform pattern and practice, was to recruit, entice, and lure children, knowing that they had not attained eighteen years, or women, then employ  force and coercion to cause these victims to engage in sex acts for which he, through the Nygard Companies, always provided something of value.  The explicit or implicit *quid pro quo* was always intended for Nygard to receive a sex act.

205.    Nygard also intentionally used the Nygard Companies' resources and brand to entice and to cause sex acts, for which he always provided the Nygard Companies' resources as "value."  The Nygard Companies, therefore, financed his commercial sex acts.

206.    And the Nygard Companies also benefited from "pamper parties" and other corporate events,[52] which Nygard used to gain access to his victims, by promoting its brand and its products in the Bahamas and around the world.

207.    The Nygard Companies have actual knowledge that Nygard engaged in commercial sex acts with children and with young women by means of force, fraud, and/or coercion through Nygard—the founder, current chairman, and 100% owner of the companies.

**D.    Consistent with His Uniform Pattern and Practice, Jane Does Nos. 1-10 Were Forced to Engage in Commercial Sex Acts with Nygard by Means of Force, Fraud, and Coercion and/or Had Not Attained the Age of Eighteen Years.**

**1.    Jane Doe No. 1**

208.    Jane Doe No. 1 is a Bahamian citizen born in Nassau, New Providence, the Bahamas, on March 28, 2001.

209.    On July 4, 2015, Jane Doe No. 1 was walking through the Mall at Marathon, Nassau, the Bahamas (the "mall") with two friends.  She had just turned fourteen years old.

210.    The Nygard Store recently opened at the mall, and models were walking around the mall asking people to come into the store to try on clothing.

211.    When she approached the store, a model was standing in the entrance and asked her to come inside.  The model handed her a pair of pants and told her to try them on.  Jane Doe No. 1 went to the changing room, but the changing room had no curtains or doors on them.  As she began to change, three of the workers started taking pictures.  She asked if there was anywhere else to change, and the models responded that the rooms were still being renovated, so there was nowhere else to go.

---

[52] *See* https://ewnews.com/711-rapes-presented-to-hospitals-since-july-2013;

212.    Jane Doe No. 1 could not fit in to the pants because they were too big.  She asked if they had any smaller sizes, and she was told that she was trying on the smallest size available. A few minutes later, Nygard walked in and asked to take her measurements.  He rubbed her inner thighs and buttocks as he personally took her measurements.

213.    Nygard asked Jane Doe No. 1 what grade she was in, and Jane Doe No. 1 responded that she was in grade 9.

214.    Nygard asked her if she modeled and told Jane Doe No. 1 that she had the body for it.

215.    Nygard told her that his name was Peter Nygard and asked her if she wanted to work for him.  Nygard instructed her to give one of the models her phone number, and Jane Doe No. 1 gave it to him because she wanted to be a model.

216.    Approximately three days later, Jane Doe No. 1 received a call from one of Nygard's ComCor workers—paid by the Nygard Companies.

217.    The worker indicated that she was contacting her about the "modeling situation" with Nygard.  She was instructed to be ready at 6:00 p.m., wear a dress and heels, and do her make-up.

218.    Jane Doe No. 1 was picked-up in a white SUV at her house by another Nygard employee.  When she got in the car, there were already two girls in the back seat.

219.    When they arrived at Nygard Cay, the three girls were registered at the security office and subsequently escorted to a dining area near the beach.

220.    They ate with other guests, while they waited for Nygard to join them.

221.    Nygard eventually joined them and began playing poker.

222.    Jane Doe No. 1 stood to the side and watched them play.

223.    About ten minutes later, Nygard approached Jane Doe No. 1 and asked her if they could go somewhere quieter to "discuss business."  Jane Doe No. 1 agreed—believing that they were going to discuss a modeling opportunity—and Nygard escorted her upstairs.

224.    Jane Doe No. 1 was expecting to be taken to an office and was surprised when they entered a bedroom.

225.    Jane Doe No. 1 became nervous, and Nygard assured her that he doesn't bite and told her to sit down and get comfortable.

226.    Nygard then turned on the television, which immediately began showing pornography.  The pornography depicted a man rubbing feces over a woman's body.  Nygard asked Jane Doe No. 1 if she was familiar with what the pornography was showing, and she responded that she was not.

227.    Nygard then went into a closet that was next to the bed and pulled out a dildo and K-Y Jelly.  Nygard asked her to "try something new."

228.    Jane Doe No. 1 responded that she could not do that and that she only came to discuss modeling.  Nygard responded that he would discuss modeling afterwards.  He instructed Jane Doe No. 1 to pick up the dildo, apply the K-Y Jelly, and to insert it into his anus.

229.    Jane Doe No. 1 did not say anything because she was afraid.  Nygard got onto the bed and knelt down on his knees, turning and pointing his anus toward Jane Doe No. 1.  Nygard repeated his instruction, but with more force.

230.    Jane Doe No. 1 did as she was instructed because she was afraid.  Jane Doe No. 1 continued to penetrate Nygard's anus with the dildo for about ten minutes, during which time Nygard began to masturbate.

231.    Nygard then told Jane Doe No. 1 that it was her turn to "have some fun." Nygard approached her and Jane Doe No. 1 asked him to stop.

232.    Nygard told her not to worry, reached around her neck, and began unzipping her dress. Nygard then put on a condom and began kissing Jane Doe No. 1's neck and began licking her down to her breasts.

233.    Nygard then began to open Jane Doe No. 1's legs as she tried to close them and push him off her. As Jane Doe No. 1 tried to push Nygard off, he held her hands back and pinned them against the headboard.

234.    Jane Doe No. 1 began to cry as Nygard forced his penis into Jane Doe No. 1's vagina. Jane Doe No. 1 was a virgin.

235.    After raping Jane Doe No. 1, Nygard instructed her to go into the bathroom and put her clothes on.

236.    Jane Doe No. 1 entered the bathroom, looked in the mirror, and noticed that her make-up was messy from crying. She cleaned her face and went back into the bedroom, at which point Nygard told her it was time to go.

237.    As they were walking down the stairs, Nygard handed Jane Doe No. 1 an envelope and said, "this is for you." Jane Doe No. 1 did not open the envelope or ask what was inside.

238.    As Jane Doe No. 1 walked downstairs, she saw another young girl walking up towards Nygard's bedroom. When they reached the last set of stairs, Nygard left Jane Doe No. 1 and headed back up to the bedroom.

239.    Jane Doe No. 1 went back to the dining area where she found the two employees who brought her there. She was escorted back to the white SUV and was transported back to her home by a Nygard Companies employee.

240.    When Jane Doe No. 1 got back home, she experienced extraordinary pain in her vagina.  She took a shower and went to bed.

241.    She never told anyone what happened to her because she was afraid and embarrassed.  She never returned to Nygard Cay.

**2.      Jane Doe No. 2**

242.    Jane Doe No. 2 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on March 14, 1997.

243.    In 2011, at the age of fourteen, Jane Doe No. 2 entered the Miss Teen Bahamas Galaxy beauty pageant competition.

244.    Her family was impoverished, and they sought sponsorship to help cover her pageant costs.

245.    Because she was only fourteen, Jane Doe No. 2 was assisted by her mother, who tried helping her find sponsorship from individuals and businesses.  An ex-colleague of Jane Doe No. 2's mother suggested that she contact Nygard, as he might be interested in sponsoring Jane Doe No. 2.

246.    Jane Doe No. 2's mother put together a portfolio with Jane Doe No. 2's photographs and biography and submitted it to the office at Nygard Cay.

247.    Jane Doe No. 2's portfolio was reviewed and returned by a Nygard employee, who informed her that Nygard was not granting sponsorships at that time.

248.    Jane Doe No. 2's mother continued to make follow-up calls to Nygard Cay, in an attempt to get her daughter a sponsorship.

249.    Eventually, she developed a relationship over the phone with Nygard's daughter, Bianca Nygard.

250.    In June 2011, Jane Doe No. 2 and her mother were invited to attend a "pamper party" at Nygard Cay.

251.    Upon arriving at Nygard Cay, Jane Doe No. 2 was registered at the ComCor office where Nygard employees took down her contact information and photographed her.

252.    Jane Doe No. 2's mother had a conversation with Bianca Nygard about a potential sponsorship.  Bianca Nygard instructed her to re-submit Jane Doe No. 2's portfolio.

253.    Jane Doe No. 2 and her mother spent time at the party.  Jane Doe No. 2 saw Nygard at the party but did not have any direct contact with him.

254.    Jane Doe No. 2 and her mother went home and did not have any further contact with Nygard or his employees until August 2011, when they were invited to another "pamper party."

255.    Jane Doe No. 2 attended the "pamper party" again with her mother.  When they entered Nygard Cay, a security guard explained to Jane Doe No. 2's mother that she did not need to attend the "pamper party" with Jane Doe No. 2 as she was "like family now."  Her mother stayed anyway.

256.    Jane Doe No. 2 and her mother each got pedicures at the "pamper party."  They did not see anything unusual, and returned home later that evening.

257.    Approximately two weeks later, Jane Doe No. 2 received a WhatsApp text message from a Nygard Companies' ComCor worker inviting her to another "pamper party."

258.    She was instructed to bring some female friends too.

259.    Jane Doe No. 2 did not tell her mother (because she knew her mother would disapprove) about the "pamper party" this time and she did not invite any friends to attend the pamper party with her.

260.    Following more communications with Nygard Companies' ComCor employees, Jane Doe No. 2 was transported to the "pamper party" by a Nygard Companies' employee.

261.    When she arrived, there were a number of young girls her age, including another pageant contestant who she knew.

262.    Jane Doe No. 2 received a manicure and walked into the foyer, where she saw Nygard sitting at a table surrounded by beautiful models.  She did not approach Nygard, but noticed him looking at her.  As Jane Doe No. 2 talked to another girl, the Nygard Companies' driver approached her and suggested that she go talk to "the boss."

263.    Jane Doe No. 2 responded that she did not feel comfortable going over to talk to Nygard.  The driver told her that if she went over to talk with him, Nygard would give her a sponsorship.

264.    The driver then offered to escort Jane Doe No. 2 over to Nygard and she agreed. The driver introduced her to Nygard as Miss Teen Bahamas.

265.    Nygard stood up, shook Jane Doe No. 2's hand, and told her that she was beautiful and that she had "luscious lips."

266.    Nygard asked Jane Doe No. 2 what she was drinking, and she responded that she was drinking cranberry juice.  Nygard asked her if she drank alcohol, and she responded that she was a teenager and was not allowed to drink.

267.    Nygard told her that she was at a private event and could do whatever she wanted.

268.    Nygard instructed the girl sitting to his right to move and offered the seat to Jane Doe No. 2.  Nygard then instructed the bartender to bring her a glass of red wine.

269.   Nygard asked Jane Doe No. 2 about herself.  Jane Doe No. 2 explained that she already sent him her portfolio and he rejected it.  Nygard responded that had he known how beautiful she was, he would have sponsored her.

270.   Before Jane Doe No. 2 finished her first glass of wine, Nygard instructed the bartender to bring her a second glass.  Jane Doe No. 2 continued to drink wine as they talked at the table.

271.   Nygard asked Jane Doe No. 2 if she wanted to be a model.  He also told her that if she stuck with him, she could travel all over the world with him.  He pointed to several other women in the room who were his models and traveled with him to fashion shows in New York and London.

272.   Jane Doe No. 2 had two more glasses of red wine, which Nygard instructed the bartender to bring her.

273.   Eventually, Nygard called the bartender over and whispered in his ear.  The bartender returned with a bag of pills.  There were white, blue, and pink pills all in a small blue zip-locked bag.

274.   Nygard showed the bag to Jane Doe No. 2 and told her that the pills would help her become a model, because all models did them.  He told her that the pills would make her feel good and help her do well.

275.   Nygard handed her the three pills and instructed her to take them all at once.  Jane Doe No. 2 took the pills with wine, as Nygard instructed.

276.   Approximately fifteen minutes after taking the pills, Jane Doe No. 2 got up to use the restroom.  While in the restroom, she began to feel dizzy, and the room began to spin.

277.   She returned to the table where another glass of wine was waiting for her.

278.     Nygard then escorted her away from the foyer area, holding her hand, and led her to his bedroom.  Once they arrived in his bedroom, Nygard laid her down on the bed and told her to relax.

279.     He walked away for approximately five minutes and returned with a dildo in his hands.

280.     He removed Jane Doe No. 2's pants and underwear and attempted to force the dildo into her vagina.

281.     Jane Doe No. 2 resisted and told Nygard to stop because it hurt, but Nygard did not stop.

282.     Nygard instructed her to "relax" and stated that "it has to be done sooner or later."

283.     At that point Jane Doe No. 2 blacked out and does not know what Nygard did to her while she was unconscious.

284.     The next morning, Jane Doe No. 2 awoke and saw Nygard still sleeping next to her in the bed.  She immediately got out of the bed and noticed blood on the sheets.

285.     She went to the bathroom and immediately cleaned herself up.  There was blood around her vagina.  She cleaned herself up as quickly as possible.

286.     When she came out of the bathroom, she noticed her pants and underwear on the floor.  Nygard was awake and told her that her life was "going to be different" now.

287.     He then reached over to a dresser next to the bed and handed her approximately $5,000, in $100 bills, in U.S. currency.

288.     Nygard instructed her not to tell anyone what happened and told her that he would look out for her.

289.   Jane Doe No. 2 initially refused to take the money, but Nygard insisted that she take it.

290.   Nygard asked her if she wanted him to have one of his drivers take her home, but she declined.

291.   Jane Doe No. 2 called her aunt to pick her up at a nearby mall.

292.   At that point, Nygard's personal assistant, Pam (another Nygard Companies' employee), came up to the room to escort Jane Doe No. 2 downstairs.

293.   Jane Doe No. 2 was escorted to a black bus that had a picture of Nygard's face on it.  She was the only person on the bus, and the driver took her to the Charlottesville shopping center, near Old Fort Bay.

294.   Jane Doe No. 2's aunt then picked her up from there and drove her home.

295.   Jane Doe No. 2 was a virgin prior to being raped by Nygard.

296.   In November 2011, Jane Doe No. 2 was invited to another "pamper party" via text message by a Nygard ComCor employee.

297.   She decided to go to the "pamper party," because she believed that Nygard would make her a model—like he had promised he would do.

298.   When she arrived at the "pamper party," Nygard approached her and asked her how she was doing.  He began instructing the bartender to bring her wine again.  He again offered her pills, but Jane Doe No. 2 declined.

299.   Nygard again led Jane Doe No. 2 to his bedroom.

300.   When they arrived, Nygard instructed Jane Doe No. 2 to play with his genitals, gave her lubricant and a dildo, and told her to penetrate his anus.

301.    Afraid, and hoping for the modeling opportunity that Nygard had promised her, Jane Doe No. 2 did as she was instructed.

302.    Later, Jane Doe No. 2 received text messages from a Nygard Companies' ComCor employee inviting her to travel with Nygard to Ohio, Canada, and New York.

303.    After the November 2011 "pamper party," Jane Doe No. 2 began receiving regular invitations to attend "pamper parties" at Nygard Cay.

304.    Jane Doe No. 2 became a regular guest, on the hope that she would become an international model for the Nygard brand.

305.    It did not happen for several years.

306.    In 2015, Nygard launched his Nygard Slims brand, and Jane Doe No. 2 modeled the pants at the grand opening of the Nygard store at the Marathon Mall.

307.    She was given a check for over $3,000 from the Nygard Companies.   After grooming and abusing Jane Doe No. 2, Nygard converted her into a recruiter to secure other young girls for him to abuse.

308.    Jane Doe No. 2, a young victim, did so, in order to avoid having to satisfy Nygard's perverse sexual desires herself.

309.    Nygard would instruct Jane Doe No. 2 to offer the young girls drugs.

310.    If the girls did not want to sleep with Nygard, Jane Doe No. 2 would sometimes put the drugs in their drinks or food without their knowledge.

311.    Jane Doe No. 2 has first-hand knowledge of other girls who Nygard had delivered to him for his sex trafficking ring.

312.     Each time Jane Doe No. 2 visited Nygard Cay and recruited girls for him, Nygard would give her large sums of cash—never less than $2,000 and always in U.S. currency (from the Nygard Companies).

313.     On February 7, 2017, Jane Doe No. 2 went to Nygard Cay to attend another "pamper party."

314.     They played poker until very late, and Nygard invited her to his room.

315.     Nygard then insisted that Jane Doe No. 2 defecate and/or urinate in his mouth.

316.     Jane Doe No. 2 responded that she did not wish to do that to him.  He offered to give Jane Doe No. 2 drugs that would help her to defecate.

317.     Jane Doe No. 2 told Nygard no and decided she could no longer take Nygard's perverse sexual fetishes.

**3.     Jane Doe No. 3**

318.     Jane Doe No. 3 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on July 25, 1995.

319.     In June 2011, she was fifteen years old, when she met one of Nygard Cay's ComCor employees.

320.     The employee frequented Jane Doe No. 3's neighborhood.  The employee introduced herself to Jane Doe No. 3 and a few other girls.

321.     She stated that she had a job for them to do, but did not specify what the job was.

322.     She told Jane Doe No. 3 to be ready the next day and that someone would pick her up.

323.     The next day, at approximately 1:00 p.m., a white SUV arrived at Jane Doe No. 3's house and transported her to Nygard Cay.

324.    When she arrived, she saw the employee, who told her that the job was not ready yet and to go to the salon and spa until she returned.

325.    Jane Doe No. 3 was taken to the spa and given a professional massage.  It was her first time having a massage.

326.    After the massage, Jane Doe No. 3 had lunch with some of the other guests.

327.    The employee arrived and told her that she wanted her to meet someone.  Jane Doe No. 3 followed the employee upstairs to Nygard's bedroom, where she was introduced to Nygard, who was sitting at a small round table.

328.    Nygard began a conversation with Jane Doe No. 3, at which point the employee left the room.

329.    Nygard offered her some wine, and she accepted.

330.    After another glass of wine, Nygard asked Jane Doe No. 3 if she had ever had sex before, and she responded that she had not.

331.    At this point, she became afraid.

332.    Nygard took her over to the bed and began to rub her legs and face.

333.    He sat down next to her and slowly pushed her body back onto the bed.  Nygard took a condom from the drawer and put it on.

334.    He began kissing her on her stomach and she began trembling in fear.

335.    She shouted "no" and began to cry.  Nygard grabbed her closer, put all of his weight on her, and penetrated her vagina with his penis.

336.    She told him to stop and resisted him, but he overpowered her.

337.    After Nygard raped her, Jane Doe No. 3 was bleeding from her vagina, and there was blood on the sheets.

338.   Jane Doe No. 3 told Nygard that she wanted to go.

339.   He pointed her toward the bathroom and told her to clean off.

340.   She took a shower, and when she finished, Nygard was no longer in the room.

341.   She got dressed and waited for someone to return.

342.   Eventually, the employee returned and asked her if she was okay.  She responded that she was afraid.  The employee led her back downstairs, and Jane Doe No. 3 sat by herself until the driver returned to take her home.

343.   Before Jane Doe No. 3 left, the employee handed her approximately $200 in U.S. currency.

344.   The following week, some of Jane Doe No. 3's friends showed her a text message from the employee, instructing them to be ready to go to Nygard Cay that Sunday.

345.   The next day, Jane Doe No. 3 told her fourteen year-old cousin, Jane Doe No. 4, about the employee and the "pamper party" at Nygard Cay.  She did not, however, tell Jane Doe No. 4 what had happened to her there.

346.   Jane Doe No, 3 and Jane Doe No. 4 went to Nygard Cay.

347.   When they arrived, they were registered at the security station near the front gate.

348.   Inside, Jane Doe No. 3 was not feeling well, so she sat by herself, while the other girls went to eat.

349.   Jane Doe No. 3 went to the bathroom, and, when she returned, she did not see Jane Doe No. 4.

350.   She asked one of the other girls at the pamper party where she went, and they told her that she went with the employee.

351.    Later, someone told Jane Doe No. 3 that her mother was outside the gate at Nygard Cay, threatening to call the police if they did not let her in to get the girls.

352.    She did not want to leave without Jane Doe No. 4, and she was very scared.

353.    She found Jane Doe No. 4 a short time later.

354.    Jane Doe No. 4 stated that she needed to go get her bag, which she left at the pool area.  She returned a short time later, and they ran toward the gate, where they saw Jane Doe No. 3's mother shouting.

355.    They immediately got in the car, and she drove them home.

356.    Neither Jane Doe No. 3 nor Jane Doe No. 4 told Jane Doe No, 3's mother what had happened to them at Nygard Cay.  Instead, they told her that the employee had offered them jobs cleaning the bathrooms.

357.    She instructed the girls never to go back again.

**4.    Jane Doe No. 4**

358.    Jane Doe No. 4 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on February 12, 1997.

359.    In June 2011, she was fourteen years old when her cousin, Jane Doe No. 3, told her about a "pamper party" that she attended at Nygard Cay.

360.    Jane Doe No. 4 decided to go.

361.    At the party, Jane Doe No. 4 went to the pool house and changed into her bathing suit.  She went to a beach chair and sat there with her bag next to her.

362.    After about 30 minutes, she went and got a manicure and pedicure.  She returned to her beach chair and received a drink with alcohol in it.

363.   Shortly thereafter, Nygard approached her and asked her if she had ever thought about modeling.

364.   He told her that he thought that she would be a good candidate, based upon her body structure.  He then told her that he had connections, if she wanted to try it.

365.   Nygard asked her if she wanted to go somewhere quieter to talk and motioned for her to follow him.

366.   He led her up the stairs, at which point Jane Doe No. 4 began to hesitate.  He told her not to be scared.  She followed him up the stairs and into his bedroom.

367.   Once they arrived in the bedroom, Nygard invited her to get comfortable on the bed.

368.   Nygard turned on the television, which was playing pornography showing a woman having oral sex with a man.

369.   After some time, Nygard sat down on the bed next to her and began stroking her hair and rubbing her back.  Jane Doe No. 4 was scared and uncomfortable.

370.   She asked him if this was his way of talking about modeling, and he replied that he wanted to have sex with her.

371.   Nygard began removing his clothes and moved toward her.  Nygard pulled the strings on her bathing suit, removing it, and began licking her neck, moving downward until he began performing oral sex on her.

372.   Jane Doe No. 4 attempted to close her legs, but Nygard pushed them open. She continued to try to close her legs, but he overpowered her.

373.   Nygard then moved upward and began to penetrate her vagina with his penis.

374.    After some time, he then instructed her to perform oral sex on him until he ejaculated.

375.    Prior to this encounter she was a virgin.

376.    Jane Doe No. 4 then went into the bathroom and took a shower.  She put her clothes on, and when she came out, Nygard gave her a white envelope and told her "this is for you."

377.    Nygard then told her to give him his contact information and that he would contact her about modeling.  The envelope contained approximately $5,600 in U.S. currency.

378.    Jane Doe No. 4 left the room, and as she was heading downstairs, she saw her cousin, Jane Doe No. 3, looking for her and saying that her mother was outside waiting for them.

379.    Jane Doe No. 4 returned to the pool area to get her bag, and they left together with Jane Doe No. 3's mother.

380.    She never returned to Nygard Cay.

**5.    Jane Doe No. 5**

381.    Jane Doe No. 5 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on August 7, 1992.

382.    In July 2009, when she was seventeen years old, she was invited to a "pamper party" by her friend.

383.    While at the party, Jane Doe No. 5 consumed multiple alcoholic beverages.

384.    While they were drinking on the beach, Nygard approached the friend and gestured at her to follow him.

385.    The friend motioned to Jane Doe No. 5 to come with her because she did not want to go with Nygard alone.

386.    Nygard took them up to his bedroom and gave them more to drink.

387.    After drinking the drinks, Jane Doe No. 5 began to feel different.

388.    Nygard instructed the girls to touch one another sexually, and they complied.

389.    After several minutes, Nygard joined and began touching the girls.

390.    Nygard then sodomized Jane Doe No. 5 against her will.

391.    Afterwards, she was bleeding from her anus.

392.    Nygard then asked the girls to defecate on him, but neither of them could or would do so.

393.    Nygard gave Jane Doe No. 5 $200 in U.S. currency and led the girls downstairs.

394.    He gave permission for them to leave, and they drove home.

395.    Jane Doe No. 5 never returned to Nygard Cay.

**6.      Jane Doe No. 6**

396.    Jane Doe No. 6 is a Bahamian citizen, born in Nassau, New Providence, the Bahamas, on August 28, 1992.

397.    In August 2008, when she was fifteen years old, she was invited to a "pamper party" by the Nygard Cay DJ, named "Shorts."[53]

398.    Upon arriving, she was processed and registered in the ComCor database and her photograph was taken.

399.    While at the party, Jane Doe No. 6 had multiple alcoholic beverages.

400.    Jane Doe No. 6 also saw several other children that she knew at the party.

401.    Jane Doe No. 6 was introduced to Nygard.  Within minutes of the introduction, Nygard spun her around and told her "Nice ass."

---

[53] *See* https://www.youtube.com/watch?v=SVQADmCs77s (detailing unveiling of Nygard Cay "beach disco.").

402.    Later in the evening, Nygard invited Jane Doe No. 6 to accompany him to get some marijuana to smoke.

403.    Jane Doe No. 6 was not afraid because Nygard had a high profile in the Bahamas, and she held him in high regard.

404.    Nygard took her up to his bedroom.  He then undressed and went into the Jacuzzi.

405.    Jane Doe No. 6 began to feel lightheaded from the alcoholic drinks that she had consumed.

406.    Nygard got out of the Jacuzzi and told Jane Doe No. 6 to get comfortable.

407.    Nygard opened a drawer filled with pills and told Jane Doe No. 6 to take some, but she declined.

408.    Nygard then untied her bathing suit and began undressing her.

409.    He told her that he wanted her to defecate on his face, and she told him no.

410.    Nygard began fondling Jane Doe No. 6 and pushed his finger into her anus.

411.    Jane Doe No. 6 tried to fight Nygard off, but he became more aggressive the more that she fought.

412.    He then attempted to have anal sex with Jane Doe No. 6 but was unable to penetrate her anus.

413.    He then penetrated her vagina and proceeded to rape her.

414.    Jane Doe No. 6 told Nygard to stop many times and continued to fight, but he overpowered her.

415.    After Nygard was done, Jane Doe No. 6 got dressed immediately and tried to leave the room.  Before she could leave Nygard told her to take a handful of cash in U.S. currency.

416.    Jane Doe No. 6 refused the cash and left the room.

417.   She found her friends and left Nygard Cay.  She never returned.

**7.      Jane Doe No. 7**

418.   Jane Doe No. 7 is a Bahamian citizen, born on April 13, 1992.

419.   In 2010, when she was 18 years old, Jane Doe No. 7 was invited to a "pamper party" at Nygard Cay by a friend.

420.   Upon arrival, she was processed and registered in the ComCor database and her photograph was taken.

421.   Jane Doe No. 7 consumed several alcoholic beverages while at the party.

422.   Nygard approached her and introduced himself to her.  He then led her upstairs to the bedroom.

423.   Nygard invited Jane Doe No. 7 into the Jacuzzi, and she got in.

424.   Nygard made sexual advances toward her in the Jacuzzi, and she resisted.

425.   Nygard then made a drink for Jane Doe No. 7, which she drank completely.

426.   Within several minutes, Jane Doe No. 7 began feeling nauseous and sleepy.

427.   Nygard asked her to urinate in his mouth.

428.   Jane Doe No. 7 then bent over the bed because she could no longer stand.  Nygard was beside her.

429.   Jane Doe No. 7 does not recall what happened next because she kept slipping in and out of consciousness.

430.   She awoke with pain in her anus and blood in her underwear.

431.   Nygard paid Jane Doe No. 7 in U.S. currency and sent her away.

432.   She left Nygard Cay and never returned.

**8.     Jane Doe No. 8**

433.    Jane Doe No. 8 is a Bahamian citizen, born on September 12, 1984.  In 2008, Jane Doe No. 8 was an employee of Nygard Cay.

434.    Jane Doe No. 8 was often tasked with driving to pick up girls who didn't have a ride to a pamper party, hosting pamper parties, recruiting women for pamper parties, and performing household duties at Nygard Cay.

435.    Jane Doe No. 8 was aware of Nygard's sexual appetites, since she often was the one picking up victims and driving them to and from Nygard Cay.

436.    She herself had turned down Nygard's sexual advances many times during the course of her employment at Nygard Cay.

437.    On one particular occasion in 2014, after substantial stress at the job, one of Nygard's "girlfriends" offered her a glass of wine.  The girlfriend was insistent, and, although Jane Doe No. 8 rarely drinks while at work, she accepted a glass of wine and gulped it down quickly. Then she went to Nygard's room to complete her job duties.

438.    Shortly after arriving, she noticed her arms become numb and then she fell unconscious on Nygard's bed.

439.    When she became alert again, Nygard was on top of her on his bed and was in the act of penetrating her vaginally with his penis.  She was powerless to stop him.

440.    While slipping in and out of consciousness, Jane Doe No. 8 saw three specific girlfriends walk in and witness what was happening, including the girlfriend who provided her the wine.

441.    When Jane Doe No. 8 finally became fully awake, she left the household, went out to her car, and began crying.

442.    After this occurred, she continued to work at Nygard Cay out of financial necessity.

443.    Following Nygard's rape of her, Jane Doe No. 8 actively attempted to avoid contact with Nygard and performed all the household duties she could that did not require direct contact with him.

444.    Nygard finally confronted her about the rape and told her "not to take it personally."

445.    Eventually, Nygard told Jane Doe No. 8 that she must either continue to have sex with him regularly, or that she would no longer be employed.  When she refused, she was terminated.

446.    On April 6, 2017, Jane Doe No. 8 was taking the trash out at her home in the Bahamas, when she was accosted by two of Nygard's employees.  The two employees stated that Nygard wanted to speak to her and that she needed to travel to see him.  She stated that she did not wish to see Nygard.  The employees ignored her refusal and used physical force to take her inside, confiscate her passport, and put her into a car.  She had no clothes or travel items with her.

447.    Jane Doe No. 8 was driven by the two employees to the airport and given a plane ticket to fly to Toronto.

448.    When she arrived in Toronto, Jane Doe No. 8 was only wearing shorts and a t-shirt and was freezing.  She was forced into a hotel room and restrained or guarded to prevent escape.

449.    During this time, her cell phone was confiscated and she was not allowed to let her family or friends know where she was.

450.    Nygard, however, did not appear in Toronto and the employees who abducted her provided plane tickets and, at Nygard's instruction, took her to Fort Lauderdale.

451.    In Fort Lauderdale, Jane Doe No. 8 was restrained and guarded in another hotel room under the guise of speaking to Nygard.

452.    Nygard again did not appear in Fort Lauderdale and Jane Doe No. 8 was flown back to Nassau on April 10, 2017.

**9.    Jane Doe No. 9**

453.    Jane Doe No. 9 was an employee of Nygard and the Nygard Companies.

454.    During her time as an employee of Nygard and the Nygard Companies, Jane Doe No. 9 was sexually assaulted by Nygard on numerous occasions.  On each occasion, she would resist and tell him no, but he would force himself on her.

455.    Nygard used Jane Doe No. 9's continued employment with the Nygard Companies as value and as a means to coerce and force her into commercial sex acts.

456.    In 2015, Jane Doe No. 9 was sexually assaulted by Nygard at his residence in Marina Del Ray, California.

457.    She was asleep in a guest room that had a key code lock on the door.  Nygard overrode the key code and entered the room without her permission while she was sleeping.

458.    She awoke to Nygard forcefully and physically overpowering her as she attempted to stop him from raping her.

459.    She verbally demanded he stop, but he refused and proceeded to forcefully penetrate her.

460.    After the assault, Jane Doe No. 9 sought medical treatment.

461.    Jane Doe No. 9 eventually left her employment with Nygard and the Nygard Companies due to the continuous sexual abuse that she endured.

462.    She did not report Nygard's sexual abuse because she is extremely scared of him and what he might do to her and her career aspirations.

10.     **Jane Doe No. 10**

463.    Jane Doe No. 10 is a Bahamian citizen, born on August 19, 1988.  When she was fifteen years old, Jane Doe No. 10 was vaginally and anally raped by Nygard while attending a "pamper party" at Nygard Cay.

464.    Jane Doe No. 10 had heard of "pamper parties" before from her friends and thought that they sounded fun.

465.    When she was fifteen years old, her sister invited her to come to a "pamper party" at Nygard Cay.

466.    After eating sushi and grilled meats, Jane Doe No. 10 noticed that she was not feeling well and was nauseous.

467.    She was approached by Nygard and his security guard shortly thereafter.

468.    Nygard held Jane Doe No. 10's hand and told her to follow him.

469.    Jane Doe No. 10 asked why, but Nygard refused to answer and dragged her along with him.

470.    Nygard's security guard walked with them as they arrived at what Jane Doe No. 10 soon realized was Nygard's bedroom.  She became afraid.

471.    After she and Nygard entered the bedroom, Nygard's security guard stood outside his door.

472.    Once they were alone in the room, Nygard commented on Jane Doe No. 10's body, told her that she could be a model for him, and cupped her butt with his hands.

473.    Nygard then told her to take off her clothes.

474.    Jane Doe No. 10 told Nygard that she was not comfortable doing that, as she was only fifteen years old.

475.    Jane Doe No. 10 was still not feeling well and was feeling dizzy and light-headed.

476.    Jane Doe No. 10 told Nygard that she was not feeling well and that she was ready to go home.

477.    Nygard opened a drawer and took out a small white pill.  He told Jane Doe No. 10 to take the pill, lay down, and it would make her feel better.

478.    Jane Doe No. 10 took the pill, thinking that it would make her feel better.

479.    Nygard then asked Jane Doe No. 10 if she had ever had anal sex before.  She told him that she had never heard of that before.

480.    Nygard told Jane Doe No. 10 that she was going to like it and offered her $5,000.

481.    Nygard then forced Jane Doe No. 10 onto the bed and climbed on top of her, kissing her neck and breast.

482.    Jane Doe No. 10 told him that he was making her feel uncomfortable.

483.    Jane Doe No. 10 tried to fight Nygard off of her, but he physically overpowered her.  The harder she fought, the angrier he got.

484.    Jane Doe No. 10 became overwhelmed.

485.    Nygard then forced his penis into her vagina.  It was very painful and Jane Doe No. 10 began to cry.

486.    Jane Doe No. 10 told Nygard that he was hurting her and that she was still not feeling well.

487.    Nygard told Jane Doe No. 10 to lay down on her stomach and she would feel better.

488.    Jane Doe No. 10 laid down on her stomach and Nygard immediately laid on her back and started kissing her neck.

489.     Nygard then offered Jane Doe No. 10 $10,000 to defecate in his mouth.  Jane Doe No. 10 responded that she could not do that and that she was in a lot of pain.

490.     Nygard then forced his penis into Jane Doe No. 10's anus.

491.     When he was done Jane Doe No. 10 immediately left the room and went downstairs to her sister.

492.     Jane Doe No. 10's sister could tell that she was visibly upset, but she did not tell her what had happened.

493.     They went home and Jane Doe No. 10 did not tell anyone what had happened because she was scared and embarrassed.

494.     Jane Doe No. 10 woke up the following day and she was bleeding from her anus. She was too afraid to tell her mother, so she asked her sister to accompany her to the doctor.

495.     Jane Doe No. 10 had to receive two stitches in her anus to stop the bleeding.

**E.     The Statute of Limitations Should Be Tolled for All Victims, Because Nygard Uses Threats and Force to Prevent Victims from Pursuing Their Claims.**

496.     The statute of limitations under the TVPA is ten years after the cause of action arose, or ten years after the victim reaches eighteen years of age, if the victim was a minor at the time of the alleged offense. 18 U.S.C. § 1595(c)(1), (2).

497.     Due to extraordinary circumstances and Nygard's conduct, which prevented Jane Does Nos. 1-10 and the other Class members from bringing their claims, the TVPA's statute of limitations is equitably tolled for all claims that accrued between December 19, 2003 and February 14, 2010.

498.     The general rule is that statute of limitations are subject to equitable tolling.  *See United States v. Locke*, 471 U.S. 84, 94 n.10 (1985) ("Statutory filing deadlines are generally subject to the defenses of waiver, estoppel, and equitable tolling."); *Young v. United States*, 535

U.S. 43, 49 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling unless tolling would be inconsistent with the text of the relevant statute.") (quotation marks and citations omitted).

499.    Jane Does Nos. 1-10 pursued their rights diligently and were impeded because of a combination of force, threats of force, shame, embarrassment, fear, political and law enforcement corruption, weak laws that are rarely enforced to protect the victim, and bribery.  As a result, to the extent necessary, the TVPA statute of limitations is equitably tolled.

500.    To the extent that Nygard's victims were unable to pursue their claims, they were legitimately and justifiably afraid that he would harm them if they pursued any claim against him.

501.    As discussed herein, Nygard uses his financial resources, political power, and influence in the Bahamas, and threats of force to intimidate his victims—including Jane Does 1-10 and the other Class members—and prevent them from coming forward.

502.    In fact, just recently, Nygard's attorneys bribed high-level Bahamian police to determine the identities of victims who were reporting the rapes to officials.

503.    Further, even after his victims leave his control, Nygard often continues to attempt to contact them, in an intimidating manner, intending to instill in his victims and remind them of his power and ability to hurt them.

504.    Due to his power and influence in the Bahamas and worldwide, Nygard's victims reasonably believe that he can have them killed if they pursue their claims.

505.    It is widely believed that Nygard pays thugs and/or the Bahamian police to harass and threaten his victims by slashing their tires, committing arson, threatening to arrest them, and having them followed.

506.    Nygard's illegal conduct also constitutes a recurring pattern and practice of sex trafficking.

507.    His sex trafficking activities have been occurring continuously, consistently, and systematically since, at least, 2003 in violation of the TVPA.

508.    Under the continuing violation doctrine, the statute of limitations is tolled for all victims who have been subjected to his recurring, uniform pattern and practice of sex trafficking, which includes Jane Does Nos. 1-10 and the other Class members.

## CLASS ACTION ALLEGATIONS

509.    Plaintiffs Jane Does Nos. 1, 2, 3, 4, 5, 6, and 10 bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class (the "Minor Victim Class"):

> All women who met with Peter J. Nygard in person while they were under eighteen years of age: (a) to audition for or to discuss involvement in modeling for any of the Nygard Companies; or (b) in a meeting or event facilitated, hosted, or underwritten by the Nygard Companies.

510.    Plaintiffs Jane Does Nos. 7-9 bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class (the "Adult Victim Class"):

> All women who met with Peter J. Nygard in person while they were eighteen years of age or over:  (a) to audition for or to discuss involvement in modeling for any of the Nygard Companies; or (b) in a meeting or event facilitated, hosted, or underwritten by the Nygard Companies.

511.    Plaintiff Jane Doe No. 2 brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Subclass (the "Minor Victim Recruiter Subclass"):

> All members of the Minor Victim Class who recruited other women:  (a) to audition for or to discuss involvement in modeling for any of the Nygard Companies; or (b)

to attend a meeting or event facilitated, hosted, or underwritten by the Nygard Companies.

512.    Plaintiff Jane Doe No. 8 brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Subclass (the "Adult Victim Recruiter Subclass"):

> All members of the Adult Victim Class who recruited other women:  (a) to audition for or to discuss involvement in modeling for any of the Nygard Companies; or (b) to attend a meeting or event facilitated, hosted, or underwritten by the Nygard Companies.

513.    The Classes consist of thousands of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Classes and the identities of the individual Class members are ascertainable through records maintained by the Defendants, including but not limited to the ComCor database.

514.    Plaintiffs' claims are typical of the claims of the other Class and Subclass members that they respectively seek to represent.  The claims of the Plaintiffs and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' sexual harassment, sex trafficking, and assault.

515.    There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3).  Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

516.    Common questions of fact and law affecting Class members include, but are not limited to, the following:

> a.  Whether Nygard engaged in commercial sex acts;
>
> b.  Whether the Nygard Companies knew or should have known of Nygard's pattern of and propensity for commercial sex acts;

    c.   Whether the Nygard Companies facilitated and/or participated in Nygard's pattern and practice of commercial sex acts;

    d.   Whether Defendants engaged in conduct designed to suppress complaints or reports regarding Nygard's conduct;

    e.   Whether Defendants violated the Trafficking Victim Protection Act, 18 U.S.C. § 1591(a)(1).

    f.   Whether Defendants violated the Trafficking Victim Protection Act, 18 U.S.C. § 1591(a)(2).

    g.   Whether Defendants conspired to commit violations of the Trafficking Victim Protection Act, in violation of 18 U.S.C. § 1594.

517.    Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

518.    Plaintiffs will fairly and adequately represent and protect the interests of the other Class members they respectively seek to represent.  Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class members.

## CLAIMS ALLEGED

## COUNT I

## VIOLATION OF THE TRAFFICKING VICTIM PROTECTION ACT,
## 18 U.S.C. §§ 1591(a)

519. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-519, as if fully set forth in this Count.

520. Plaintiffs bring this Count individually and on behalf of the other Class and Subclass members they respectively seek to represent.

521. Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 1591(a)(1), occurring both in and outside of the territorial jurisdiction of the United States.

522. Defendants' conduct was in or affecting interstate or foreign commerce for purposes of the TVPA.

523. Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited Jane Does Nos. 1, 2, 3, 4, 5, 6, and 10 as well as other members of the Minor Victim Class, for the purpose of causing those persons to engage in a commercial sex act, and at the time, these individuals were minors under the age of eighteen, pursuant to 18 U.S.C. § 1591(a).

524. Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited Jane Does Nos. 7, 8, and 9, as well as other members of the Adult Victim Class, for the purpose of causing those persons to engage in a commercial sex act, through the use of force, fraud, and/or coercion, pursuant to 18 U.S.C. § 1591(a).

525.    Jane Does Nos. 1, 2, 3, 4, 5, 6, and 10 as well as other members of the Minor Victim Class, did engage in commercial sex acts with Nygard, and, at the time, were under the age of eighteen years old.

526.    Jane Does Nos. 7, 8, and 9, as well as other members of the Adult Victim Class, engaged in commercial sex acts with Nygard or others at Nygard's direction, due to Nygard's use of force, fraud and/or coercion.

527.    Defendants provided or promised Jane Does Nos. 1-10, as well as other Class members, something of value in exchange for each sexual act.

528.    Defendants' conduct has caused Jane Does Nos. 1-10 and the other Class members serious and permanent harm, including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

## COUNT II

### PARTICIPATING IN A VENTURE IN VIOLATION OF
### THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1591(a)

529.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-519, as if fully set forth in this Count.

530.    Plaintiffs bring this Count individually and on behalf of the other Class and Subclass members they respectively seek to represent.

531.    Defendants participated in a venture together, in violation of 18 U.S.C. § 1591(a)(2).

532.    The Nygard Companies knowingly benefited from, and received value for, their participation in the venture, in which Nygard, with the Nygard Companies' knowledge, or in

reckless disregard of the fact, that Nygard would defraud, force, and/or coerce Jane Does Nos. 1-10, as well as other Class members, some of whom were under the age of eighteen, to engage in commercial sex acts.

533.    The Nygard Companies knew, or were in reckless disregard of the fact, that it was Nygard's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, as well as the Nygard Companies' resources to entice or recruit young and underage aspiring female models into commercial sex acts, based upon the promise of lucrative modeling opportunities or the use of his influence in their favor.

534.    Nygard and other Nygard Companies' employees had actual knowledge that they were facilitating and participating in Nygard's use of company resources to recruit, entice, coerce, and/or solicit Jane Does Nos. 1, 2, 3, 4, 5, 6, and 10, as well as other members of the Minor Victim Class, into commercial sex acts, who, at the time, were under the age of eighteen years old.

535.    Nygard and other Nygard Companies' employees had actual knowledge that they were facilitating Nygard's use of company resources to recruit, entice, coerce, and/or solicit Jane Does Nos. 7, 8, and 9, as well as other members of the Adult Victim Class, into commercial sex acts, through the use of force, fraud, and/or coercion.

536.    Despite such knowledge, the Nygard Companies paid for, facilitated, and participated in Nygard's violations of 18 U.S.C. § 1591, where the Nygard Companies knew, or were in reckless disregard of the facts that, Nygard would encounter aspiring models seeking to do business with the Nygard Companies, who were either under the age of eighteen, or coerced, defrauded, and/or forced to engage in commercial sex acts.

537.    The Nygard Companies' employees and/or agents actively participated in the scheme that led Jane Does Nos. 1-10, as well as other members of the Classes, to believe that they

would be rewarded with substantial career-advancing opportunities if they cooperated and acquiesced to Nygard's demands.

538.     This affirmative conduct of the Nygard Companies was committed knowing, or in reckless disregard of the facts that, Nygard would use Nygard Companies' money, the promise of a modeling career, and his influence in the fashion industry, which were things of value, as a means of defrauding, forcing, and/or coercing sex acts from Jane Does Nos. 7, 8, and 9, as well as other members of the Adult Victim Class.

539.     Upon information and belief, in exchange for facilitating and covering up Nygard's commercial sex acts, the Nygard Companies' employees progressed in their careers at the Nygard Companies and received financial benefits therefor.

540.     Participating in and covering up Nygard's sexual misconduct was a means of obtaining success and growth within the Nygard Companies' hierarchy.

541.     The Nygard Companies knowingly benefited financially from Nygard's sex-trafficking venture.

542.     By facilitating Nygard's commercial sex acts in foreign commerce, the Nygard Companies enjoyed the promotion and promulgation of the Nygard Companies' projects internationally.

543.     Nygard is the face of the Nygard Companies, and his presence and promotion in foreign commerce brought exposure and prestige to the Nygard Companies.

544.     The Nygard Companies facilitated Nygard's commercial sex acts in foreign commerce to obtain the enormous publicity that Nygard garnered by promoting the Nygard Companies' products internationally, which financially benefited the Nygard Companies.

545.   The Nygard Companies also benefited from the services that Nygard's sex workers were forced to provide to the Companies including, without limitation, modeling company clothing for company executives, preparing Nygard for his business meetings, attending business meetings, developing clothing design ideas, and perpetuating Nygard's playboy image, which is a crucial component of the Nygard brand.

546.   The Nygard Companies' brand also benefited financially from the promotion and advertisement of "pamper parties," Nygard Cay, and Peter Nygard's playboy persona by promoting them on the Nygard Companies' website.

547.   The Nygard Companies also used "pamper parties" at the Nygard Cay, Bahamas and the Marina Del Ray, California locations to promote their products and brands.

548.   The Nygard Companies also used the World Headquarters and New York apartment above the World Headquarters for "sex parties" to promote their products and brands.

549.   The Nygard Companies' conduct has caused Jane Does Nos. 1-10 and the other members of the Classes serious harm including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

### COUNT III

**CONSPIRACY TO COMMIT VIOLATION OF THE
TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594**

550.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-519, as if fully set forth in this Count.

551.     Plaintiffs bring this Count individually and on behalf of the other Class and Subclass members they respectively seek to represent.

552.     The Nygard Companies conspired, by agreement or understanding, to further Nygard's unlawful plan and/or purpose to commit illegal commercial sex acts with Jane Does Nos. 1-10 and other Class members.

553.     The Nygard Companies committed overt acts in furtherance of the agreement or understanding by playing an active role in recruiting, enticing, coercing, and inducing Jane Does Nos. 1-10 and other Class members, through promises of lucrative modeling opportunities and connections and influence that would substantially advance their careers.

554.     The Nygard Companies' participation in the furtherance of Nygard's illegal sex trafficking plan and/or purpose was intentional and/or willful and, therefore, the Nygard Companies intentionally and/or willfully caused Nygard's commission of the sex acts with Jane Does Nos. 1-10 and other Class members in its affirmative acts supporting Nygard.

555.     The Nygard Companies knew that their acts and conduct supporting and facilitating Nygard would lead to unlawful commercial sex acts by Nygard with young women and children, who were aspiring models, including Jane Does Nos. 1-10 and other Class members.

556.     The Nygard Companies' conspired with Nygard through their affirmative acts and provided substantial support to Nygard committing commercial sex acts upon Jane Does Nos. 1-10 and other Class members.

557.     The Nygard Companies' conduct has caused Jane Does Nos. 1-10 and other Class members serious harm, including, without limitation, physical, psychological, financial, and reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel

a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor, and against Defendants, as follows:

a.      That the Court certify the Classes, name Plaintiffs as Class Representatives, and appoint their lawyers as Class Counsel;

b.      That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts and practices described herein;

c.      That the Court award Plaintiffs and the other members of the Classes compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

d.      That the Court award punitive or exemplary damages in an amount to be determined at trial;

e.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

g.      That the Court grant all such other relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  February 13, 2020

By:   */s/ Greg G. Gutzler*       
Greg G. Gutzler
**DiCELLO LEVITT GUTZLER LLC**
444 Madison Avenue, Fourth Floor
New York, New York  10022
Tel.:  646-933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
Amy E. Keller*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Tel.:  312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com

Mark A. DiCello
Robert F. DiCello*
Justin J. Hawal*
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio  44060
Tel.:  440-953-8888
mad@dicellolevitt.com
rfdicello@dicellolevitt.com
jhawal@dicellolevitt.com

Lisa D. Haba*
**THE HABA LAW FIRM, P.A.**
1220 Commerce Park Drive, Suite 207
Longwood, Florida  32779
Tel.:  844-422-2529
lisahaba@habalaw.com

*Pro Hac Vice application pending*

**Counsel for Plaintiffs and the Proposed Class**

99