# Exhibit A

File No. CI20-01-26627

## THE QUEEN'S BENCH
### Winnipeg Centre

IN THE MATTER OF: THE APPOINTMENT OF A RECEIVER PURSUANT TO SECTION 243 OF THE BANKRUPTCY AND INSOLVENCY ACT, R.S.C., C.B-3, AS AMENDED, AN SECTION 55 OF THE COURT OF QUEEN'S BENCH ACT, C.C.S.M., C.C280, AS AMENDED

IN THE MATTER OF THE PROPOSAL OF NYGARD GROUP OF COMPANIES

BETWEEN:

WHITE OAK COMMERCIAL FINANCE, LLC,

Applicant,

- and -

NYGARD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC., NYGARD NY RETAIL, LLC., 4093879 CANADA LTD., 4093887 CANADA LTD., NYGARD INTERNATIONAL PARTNERSHIP, NYGARD PROPERTIES LTD., and NYGARD ENTERPRISES LTD.,

Respondents.

---

### NOTICE OF MOTION
HEARING: WEDNESDAY, SEPTEMBER 30, 2020 AT 10:00 a.m.
BEFORE THE HONOURABLE MR. JUSTICE J. G. EDMOND

---

**LEVENE TADMAN GOLUB LAW CORPORATION**
Barristers and Solicitors
700 - 330 St. Mary Avenue
Winnipeg, Manitoba
R3C 3Z5
**WAYNE M. ONCHUENKO**
QB Box no. 105
Telephone No. (204) 957-6402
Facsimile No. (204) 957-1696
File No. 113885/WMO

File No. CI20-01-26627

## THE QUEEN'S BENCH
### Winnipeg Centre

IN THE MATTER OF: THE APPOINTMENT OF A RECEIVER PURSUANT TO SECTION 243 OF THE BANKRUPTCY AND INSOLVENCY ACT, R.S.C., C.B-3, AS AMENDED, AN SECTION 55 OF THE COURT OF QUEEN'S BENCH ACT, C.C.S.M., C.C280, AS AMENDED

IN THE MATTER OF THE PROPOSAL OF NYGARD GROUP OF COMPANIES

BETWEEN:

WHITE OAK COMMERCIAL FINANCE, LLC,

Applicant,

- and -

NYGARD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC., NYGARD NY RETAIL, LLC., 4093879 CANADA LTD., 4093887 CANADA LTD., NYGARD INTERNATIONAL PARTNERSHIP, NYGARD PROPERTIES LTD., and NYGARD ENTERPRISES LTD.,

Respondents.

## NOTICE OF MOTION

The Respondents will make a Motion before The Honourable Justice J. G. Edmond, on Wednesday, September 30, 2020, at 10:00 a.m., or as soon after that time as the motion can be heard, at the Law Courts Building, 408 York Avenue, Winnipeg, Manitoba.

**THIS MOTION IS FOR:**

1.  An Order pursuant to the Queen's Bench Rules and the *Queen's Bench Act* and the inherent jurisdiction of this Honourable Court abridging the time for service of the

Notice of Motion and materials filed in support of this Motion and dispensing with further service thereof;

2.   An order directing the Receiver and its qualified IT and Accounting professionals, who are familiar with the servers architecture and various folders and accounting software, to allow a representative of Sandra L Fawcett Chartered Professional Accountant ("**Fawcett**") to obtain remote or in person access to the servers currently located at the Inkster Property, 1771 Inkster Blvd, Winnipeg, Manitoba (the "**Inkster Property**") together with the Physical Records (as defined in the 8th Report) located at Inkster Property and Broadway Property, 702&708 Broadway Ave, Winnipeg, Manitoba (the "**Broadway Property**") forthwith.

3.   With respect to the documents on the IT Systems (as defined in the 8th Report), an Order that Fawcett shall be permitted to obtain full supervised "Read Only" access to the computers and servers to pull reports from any software and make copies of all data, including but not limited to emails and reports on the servers and computers to ensure:

   (a)   That Fawcett has copies of all records required in relation to the respondents, other corporations and personal records; and,

   (b)   Compliance with all documents required to be produced with respect to any ongoing litigation, including but limited to, the subpoenas issued from the US attorney's office.

4.      An Order directing the Receiver to produce to Fawcett and counsel for the Respondents a copy of the User Generated Electronic Files as defined by the Receiver in its reports to the Court.

5.      An Order allowing the respondents to preserve documents related to any litigation involving the respondents, Peter J Nygard and or any employees of the respondents, by providing those documents (or copies of the documents) to the respondents forthwith.

6.      An Order directing the Receiver to provide:

   (a)   an updated Statement of Receipts and Disbursements (the "**Updated SRD**") up to and including September 30, 2020 (the date that the Canadian Liquidation Sale is to be completed) (the "**Seventh Report**");

   (b)   projections of future receipts through to the conclusion of the proceeding (excluding any proceeds from the potential sale of any additional real property);

   (c)   an accounting of amounts paid to the Landlords on account of Rent to September 30, 20202;

   (d)   projections on amounts owing on account of Rent to Landlords all of which are subject to the Landlords' Charge (all capitalized terms herein are as defined in the Landlord Terms Order dated June 2, 2020); and

   (e)   actual (or, if unavailable, projected or estimated) payments outstanding to parties with claims in priority to unsecured creditors.

7.  An Order directing the Receiver not to accept any further offers on the Inkster property or Broadway property until further order of the Court;

8.  An Order lifting the stay of proceedings in the within proceedings for the purpose of permitting the Respondents (or any combination of them) to file a Notice of Intention to File a Proposal;

9.  An Order discharging the Receiver; and

10. Such further and other relief as this Honorable Court may deem just.

**THE GROUNDS FOR THE MOTION ARE:**

**Background**

1.  All capitalized terms not otherwise defined in this section shall have the meaning ascribed to them in the Eighth Report of the Receiver dated September 28, 2020 (the "**Eighth Report**").

2.  The Receiver was appointed pursuant an Order of the Honourable Justice Edmond dated March 18, 2020 (the "**Appointment Order**"). The Appointment Order was amended to limit the scope of the Receiver's appointment as it pertained to Nygard Enterprises Ltd. ("**NEL**") and Nygard Properties Ltd. ("**NPL**") as further described in the General Order. Specifically, the General Order limited the Receiver's appointment to NPL and NEL property, assets, and undertaking that were subject to the Lenders' (as defined in the First Report) security supporting certain limited recourse guarantees.

3.  Since the Appointment Order, the Receiver has, amongst other things (collectively, the "**Transactions**"):

    (a) negotiated and closed a sale of the Notre Dame Property;

    (b) Negotiated a settlement with Dillards Inc. which was the subject of the Dillard's Settlement Approval Order

    (c) negotiated and closed a sale of the Toronto Property; and

    (d) completed, with the assistance of Hilco, a liquidation of the Respondents' inventory and collection of certain outstanding accounts receivable.

**Respondents' Financial Position**

4.  The Seventh Report of the Receiver dated September 10, 2020 (the "**Seventh Report**") disclosed that the Lenders have been fully repaid their indebtedness owing by the Respondents (the "**Respondents' Borrowings**") and that the advances made by the Lenders to the Receiver in accordance with the Appointment Order (the "**Receiver's Borrowings**") have been repaid. The Seventh Report also disclosed that after payment of the Respondents' Borrowings and the Receiver's Borrowings, the Receiver held in excess of $9.2 million dollars as at September 5, 2020 (the "**Net Proceeds**").

5.  The Seventh Report also discloses that to ensure the Lenders have been indefeasibly repaid, it has reserved $6.1 million of the Net Proceeds to address any claims (the "**Priority Claims Reserve**").

6.  The Eighth Report discloses that between September 5, 2020 to September 19, 2020 the Net Proceeds had increased to in excess of $12 million (the "**Updated Net Proceeds**"), while the Priority Claims Reserve has been reduced to $2.1 million ("**Updated Priority Claims Reserve**").

7.  While the Eighth Report is not clear on amounts outstanding to the Landlords and subject to the Landlords' Charge (as defined in the Landlord Terms Order), paragraph 38 of the Eighth Report states "the Receiver estimates that there are approximately $5.5 million in accrued costs relating to payroll and vacation pay costs (including applicable government remittances), sales taxes, operating expenses, rent and fees owing to the Consultant" [emphasis added] (collectively, the "**Operating Costs**").

8.  The Eighth Report advises that the Liquidation Sale ended on September 27, 2020. Presumably the additional eight days of sales will only increase the Updated Net Proceeds.

9.  As at September 19, 2020, the Receiver is holding approximately $4.4 million, net of the Updated Priority Claims Reserve and the Operating Costs (the "**Unsecured Funds**"). These funds are presumably available to unsecured creditors. Further (and perhaps more importantly), the Receiver has not sold the Inkster Property and the Broadway Property.

10. While the Respondents acknowledge that a retail clothing business is likely not going to continue, the Inkster Property and the Broadway Property, together with the Unsecured Funds and other assets not subject to this proceeding, could form the basis

of an ongoing real estate based business. A business which, if the unsecured creditors agree, could provide for a material return to creditors.

**Document Transfer Motion**

11.     The Eighth Report notes that the IT Systems and the Physical Records of the Respondents are located at the Inkster Property and the Broadway Property. The Receiver notes that moving the IT Systems and the Physical Records is not a small task: It consists of removing 213 servers and approximately 5,100 boxes. Further the Receiver acknowledges that "the IT System is relatively antiquated with many of the servers at or near end of life in terms of operability and/or storage space, <u>therefore "unplugging", dismantling and moving the IT System carries a high degree of risk of impairment to the functionality of the IT System</u>" [emphasis added].

12.     The Eighth Report also confirms that neither the Inkster Property, nor the Broadway Property have been sold. Further, while the Receiver states that "as noted in the Second Report [dated May 27, 2020] the Receiver accepted a conditional offer on the Inkster Property, which it continues to advance with the prospective purchaser", the Receiver continues to offer the Inkster Property for sale to third parties, without any suggestion that the Inkster Property an offer on the Inkster Property would subject to a previously negotiated conditional offer.

13.     Notwithstanding that a sale of the Inkster Property and the Broadway Property is not imminent, the Receiver is proposing to provide the Respondents with 10 days to determine which Respondent will take responsibility for the Redundant Records and then

a further 15 days to determine where to store the Redundant Records and make arrangements to pick up said Redundant Records. The time period is unreasonable, and the document transfer is likely not necessary at all as efforts should be focused on assisting the Debtors in preserving the remaining assets so they can make a proposal to unsecured creditors that is better than simply liquidating assets and distributing funds.

14. The Nygard computer system is able to provide "read only" access to third parties. Further, there is no reason for the respondent's access to the IT Systems to be limited to the redundant documents if produced by way of "Read Only" Access.

### Discharge of Receiver and Appointment of a Proposal Trustee

15. The Receiver's appointment was pursuant to an application made by the Lenders as a means of enforcing upon its security. While the Receiver is a court appointed officer, its authority is (or was) derived from the Lenders' security. In order to achieve its mandate, the Receiver must account for priority payables (such as employee source deductions and claims pursuant to section 81.4 of the *Bankruptcy and Insolvency Act* the "**BIA**") and satisfy court ordered priority charges (such as the Landlords' Charge). The Receiver has completed this portion of its mandate and has, by its own admission, indefeasibly repaid the Lenders.

16. The Receiver generally has an obligation to satisfy the Court that it has either: (a) liquidated all of the Respondents property, assets, and undertaking and the Lenders are still suffering a shortfall; or conversely (b) that it is comfortable all creditors (including unsecured creditors) can be paid in the ordinary course.

17.     While the foregoing is a general statement, paragraph 15 above does not apply in the event that the Respondents are prepared to continue in a court supervised process overseen by a court officer, such as a proposal process under the BIA (the "**BIA Proposal Process**").

18.     Further, with the lenders being indefeasibly repaid, it is unclear whether NEL and NPL are insolvent.

19.     The Respondents propose a discharge of the Receiver, contemporaneously with the Respondents submitting to a BIA Proposal Process.

20.     The Respondents acknowledge that only two weeks ago it sought and obtained an Order withdrawing its previous BIA Proposal Process and discharging A. Farber & Partners Inc. ("**Farber**") as Proposal Trustee (the "**Proposal Withdrawal Order**"). The Proposal Withdrawal Order was part of a larger, multi-party settlement referred to as the E/B Settlement Agreement. The Proposal Withdrawal Order ended a BIA Proposal Process that contemplated a 150 store retail restructuring which is no longer the reality. Further, the Proposal Withdrawal Order gave access to a significant sum of funds held by Farber as a retainer for a possible bankruptcy. Those retainer funds were used to fund the E/B Settlement Agreement which was a benefit to the Respondents' stakeholders.

21.     In contemplation of the Receiver completing its mandate, the Respondents have retained Albert Gelman Inc. ("**AGI**"), a licensed insolvency trustee, as its financial consultant. The Respondents are confident that if AGI is appointed as proposal trustee,

it will be able to coordinate with the Receiver regarding any transition related matters and protect the interest of the Respondents' stakeholders.

22. Finally, the Respondents note that the Receiver's fees and disbursements on this matter since the Appointment Order, as reported to this court (including the fees and disbursements of its Manitoba and New York counsel), are in excess of CDN $4 million dollars. If the Respondents cannot make a going concern proposal to their unsecured creditors, they believe they (with AGI's assistance and oversight) can complete a cost effective liquidation of the remaining assets.

23. Such further and other grounds as counsel may advise and this Honorable Court may permit.

**THE FOLLOWING DOCUMENTARY** EVIDENCE will be used at the hearing of the motion:

1. Affidavit of Greg Fenske, sworn September 29, 2020; and,

2. Such other material to be filed and allowed.

Date: September 29, 2020

**LEVENE TADMAN GOLUB LAW CORPORATION**
Barristers and Solicitors
700 – 330 St. Mary Avenue
Winnipeg, MB. R3C 3Z5
WAYNE M. ONCHULENKO
Phone: (204) 957-6402
Fax: (204) 957-1696