# Exhibit B

File No. CI 20-01-26627

## THE QUEEN'S BENCH
### Winnipeg Centre

IN THE MATTER OF: THE APPOINTMENT OF A RECEIVER PURSUANT TO SECTION 243 OF THE BANKRUPTCY AND INSOLVENCY ACT, R.S.C., C.B-3, AS AMENDED, AND SECTION 55 OF THE COURT OF QUEEN'S BENCH ACT, C.C.S.M., C. C280, AS AMENDED

BETWEEN:

WHITE OAK COMMERCIAL FINANCE, LLC,

Applicant,

- and -

NYGARD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC., NYGARD NY RETAIL, LLC., NYGARD ENTERPRISES LTD., NYGARD PROPERTIES LTD., 4093879 CANADA LTD., 4093887 CANADA LTD., and NYGARD INTERNATIONAL PARTNERSHIP,

Respondents.

---

**AFFIDAVIT OF GREG FENSKE**
AFFIRMED this 29th day of September, 2020

---

**LEVENE TADMAN GOLUB LAW CORPORATION**
Barristers and Solicitors
700 - 330 St. Mary Avenue
Winnipeg, MB   R3C 3Z5

**WAYNE M. ONCHULENKO**
Telephone No. (204) 957-6402
Fax No. (204) 957-1696
File No.113885/WMO

QB BOX 105

## THE QUEEN'S BENCH
### Winnipeg Centre

IN THE MATTER OF: THE APPOINTMENT OF A RECEIVER PURSUANT TO SECTION 243 OF THE BANKRUPTCY AND INSOLVENCY ACT, R.S.C., C.B-3, AS AMENDED, AND SECTION 55 OF THE COURT OF QUEEN'S BENCH ACT, C.C.S.M., C. C280, AS AMENDED

BETWEEN:

WHITE OAK COMMERCIAL FINANCE, LLC,

Applicant,

- and -

NYGARD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC., NYGARD NY RETAIL, LLC., NYGARD ENTERPRISES LTD., NYGARD PROPERTIES LTD., 4093879 CANADA LTD., 4093887 CANADA LTD., and NYGARD INTERNATIONAL PARTNERSHIP,

Respondents.

### AFFIDAVIT OF GREG FENSKE

I, GREG FENSKE, of the City of Winnipeg, in the Province of Manitoba,

AFFIRM:

1. I was the Director of Systems for the Nygard Group of Companies (and I am now a director of the Debtors) and as such have personal knowledge of the facts and matters which are hereinafter deposed to be me except where same are stated to be based on information and belief, and which I believe to be true.

2. The Debtor and Non-Debtor companies require current financial records for all companies in order to assess their financial situation and make decisions.

3. The Debtors have engaged Albert Gelman Inc. ("AGI"), a Licensed Insolvency Trustee, as it's consultant to, amongst other things, conduct an assessment of the Debtor's options and recommend a strategy for next steps, in accordance with the Bankruptcy and Insolvency Act and the Superintendent of Bankruptcy's Directives.

4. AGI's role will, in part, be to assess the viability of a proposal to the Debtor's unsecured creditors so that the Unsecured Creditors can decide if a formal Proposal is satisfactory for them or if they prefer that the Debtor's assets be realized through a bankruptcy process.

5. In this regard, AGI has advised that it requires the following information to conduct its review, pursuant to the BIA.

   a. Current chart of accounts;
   b. Current detailed trial balance;
   c. Detailed trial balance reports as at year end for each of the previous five fiscal years;
   d. Detailed GL report showing all posted transactions for each of the previous five fiscal years;

  e. Corporate tax returns for each of the previous five years;

  f. For any/all intercompany accounts, detailed GL reports showing all transactions for the previous five years;

  g. Where there were transactions with related entities outside of the Corporate Group, detailed GL reports from those entities showing all transactions between each of them and the entities comprising the Corporate Group;

  h. Externally produced financial statements for the previous five years;

  i. Current aged accounts payable listing;

  j. Current aged accounts receivable listing;

  k. Three most recently prepared bank reconciliations;

  l. Most recent notice of (re)assessment from the CRA with respect to both HST and corporate income taxes;

6. Some of the required items will need to be produced from Microsoft Dynamics AX (hereinafter "the AX System") financial system that is currently operating on the Inkster servers. The Receiver has previously advised that it has used and continues to use the Ax System to record all accounting transactions in the ordinary course.

7. The DEFA process which has been in use for the past six months is dependent on keyword and other search criteria that are then applied to reports and records which have already been saved to the server. We have not been able to obtain the information that we require as we don't know the names or naming conventions of the documents saved to the servers so the keyword searches have not worked.

8.  The DEFA process has proven to be ineffective, time-consuming and very costly to the creditors and ultimately did not produce the information that we will need for AGI to conduct its mandate.

9.  As set out above, the DEFA process searches for documentation and records already saved to the servers. In order to obtain the information that AGI requires, we will first need to pull the reports that are required from the AX System. Accordingly, the DEFA process cannot be used to produce the current financial reports from the AX System.

The Inkster Property

10. The Receiver has advised that the Inkster building has been conditionally sold and they intend on either returning the servers to the Debtors or abandoning/destroying the servers housed there, which includes the critical data housed within the servers. The Receiver's draft Court Order proposes that the servers be turned-over to the Nygard Group of Companies to be relocated and set up elsewhere.

11. However, the Receiver has also acknowledged that due to the age and complexity of the server set up and architecture, that relocating and setting up the server system elsewhere will likely result in the permanent loss of data stored within. I agree that this suggestion of relocating the servers is not a purposeful suggestion and risks loss of very important data that is unlikely to be recovered.

12. I believe that the only solution will be to allow the Debtor's to access

the data immediately.

13. In an effort to find a solution that would allow the Debtors to obtain the data that they require, on Monday, September 28, 2020, I spoke with Garret Soloway, former IT Technical Systems Manager for the Nygard Group of Companies, to discuss the physical condition of the Inkster servers and the likelihood of being able to relocate them to a new location and have them function in order to extra the data.

14. Garret advised that the relocation of all, or a portion of, the Inkster servers is not a viable solution and will result in a loss of data. Our experience with the document disclosure order is we could not get the information in time using this method.

15. There are problems with using the document disclosure order process. They are as follows:

    a. Firstly, the hardware is old and past its functional life. For instance, Garret advised and I do verily believe that he had to shut down a functioning server that had not been restarted in over 700 days. When the restart was initiated, the server would not power up. It took a long time, and in excess of $1,000.00 in parts, to get it to function, with no guarantee that the software would function properly or that the data would be preserved. Garrett, who the Receiver has engaged in the past, also recently experienced server failures that required multiple attempts to restart over a number of days.

b. Due to the age of the servers, and the combination of models/brands, sources and operating systems, the hardware requires a variety of electrical and cooling connections to function.

c. The server software is managed by an out of date control software that is complex and would require a reassembly in the exact manner. The removal of any pieces of the current hardware has the potential to cause a complete failure.

d. An estimate has been prepared by Garrett for a third-party host that estimates that the labour required to complete the physical move of the servers in the Inkster building would require approximately 500 associate hours and the cost of more than $40,000.00.

e. The quote for monthly operating expenses for the relocated system is $12,000.00 per month.

f. Garrett has advised and I do verily believe that the relocation of all or a portion of the Inkster servers will likely fail.

g. Garrett has advised and I do verily believe that the relocation of the all the servers at Inkster would require weeks of planning and testing, and there is no guarantee of success due to the factors listed above. Garrett has advised and I do verily believe that he

had a discussion this month about these issues of relocation with Pritesh Patel, an associate of the Receiver, and these same conclusions were reached.

16. Due to the risks and expenses in attempting to relocate the servers, as set out above, it is not a viable option or means for the Debtor and Non-Debtor companies to regain access to files and records to which they are entitled.

17. The Receiver has advised that it is making copies of selected User Generated Electronic Files and that they have indicated they *may* make copies of these files available to the debtor and non-debtor companies at a cost which is not yet determined. The Receiver has not provided specific information on which files they are copying and which of these files they will provide.

18. The Receiver's offer to turn over servers that the Receiver does not require is also not satisfactory as there is no guarantee that the servers will work offsite and, since servers communicate with each other, providing some servers may make the entire server system non-functional. Furthermore, given that we don't have access to the servers we don't know what server contains the information that we need.

19. As the Receiver has now confirmed that the servers are still working, this is the right point in time to access the information. We require

immediate access to the entire server system to allow us to identify which User Generated Electronic Files we require copies. We take no issue with the Receiver supervising and assisting us with the review process, so that they are aware of the reports that we need to extract from the AX System and the data that we would like copies of. I'm advised by Garrett that access can be granted on a virtual and 'Read Only' basis so that any concerns of altering or deletion of information which the Receiver may have can be avoided.

20. As part of my former responsibilities for the Nygard Companies, I created a process that allowed our external and government auditors to access all of the financial systems in a "read only" mode that allowed access to all summary and detailed reporting data.

21. Our concern is if we do not get this information immediately, that it will be forever lost to us. This information is not only critical for AGI's review but also may be needed to verify claims of unsecured creditors.

22. The use of the "read only" functionality would allow the Debtor and Non-Debtor companies to access the required information without any risk of deletion of change.

23. David Brough, formerly the Nygard Software System Architect, who is still employed 'on call' by the Receiver, is a secure 3rd party. He has the technical and software experience to run the required reporting and extracts based on the requests and needs of the Debtor and Non-Debtor companies.

24. I have been advised by American counsel for Peter Nygard, Robert Radick, and do verily believe, that Plaintiff's counsel for the class action lawsuit in the state of New York contacted him asking for assurances no documents are to be destroyed, failing such assurances, that Plaintiff's counsel would be seeking an order the documents not be destroyed.

25. I make this affidavit *bona fide*.

| | |
|---|---|
| AFFIRMED before me at the City of Winnipeg, in the Province of Manitoba through the use of videoconferencing as permitted by Order under *The Emergency Measures Act*, this 29th day of September, 2020 _____ A Barrister-at-Law in and for the Province of Manitoba. | ) ) ) ) ) ) ) ) ) ) ) )   GREG FENSKE |