# Exhibit H

RICHTER

File No.  CI 20-01-26627

**THE QUEEN'S BENCH**
**<u>WINNIPEG CENTRE</u>**

**IN THE MATTER OF THE RECEIVERSHIP OF**
**NYGÅRD HOLDINGS (USA) LIMITED, NYGARD INC.,**
**FASHION VENTURES, INC. NYGARD NY RETAIL, LLC,**
**NYGARD ENTERPRISES LTD., NYGARD PROPERTIES LTD.**
**4093879 CANADA LTD., 4093887 CANADA LTD., AND**
**NYGARD INTERNATIONAL PARTNERSHIP**

**RICHTER ADVISORY GROUP INC.**
**SUPPLEMENTARY FIRST REPORT OF THE RECEIVER**

**APRIL 27, 2020**

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................................................... 1

II. PURPOSE OF REPORT ................................................................................................................. 2

III. TERMS OF REFERENCE .............................................................................................................. 2

IV. CORPORATE CREDIT CARD ACTIVITY / DOCUMENT ACCESS ......................................... 3

V. DELETION OF DOCUMENTS ........................................................................................................ 4

VI. OTHER MATTERS ......................................................................................................................... 5

**APPENDICES**

**APPENDIX "A"** – Legal Hold Notice

**APPENDIX "B"** – Colliers listing agreement re Winnipeg Properties dated April 21, 2020

**CONFIDENTIAL APPENDICES**

**APPENDIX "1"** – Fenske File Deletion Log

**APPENDIX "2"** – Winnipeg Real Estate Proposal Summary

File No.  CI-20-01-26627

**THE QUEENS BENCH**
**WINNIPEG CENTRE**

**IN THE MATTER OF THE RECEIVERSHIP OF**
**NYGÅRD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC.,**
**NYGARD NY RETAIL, LLC, NYGARD ENTERPRISES LTD., NYGARD PROPERTIES LTD.,**
**4093879 CANADA LTD., 4093887 CANADA LTD., AND NYGARD INTERNATIONAL PARTNERSHIP**

**RICHTER ADVISORY GROUP INC.**
**SUPPLEMENTARY FIRST REPORT OF THE RECEIVER**

**APRIL 27, 2020**

## I.  INTRODUCTION

1.  On March 18, 2020 (the "**Appointment Date**"), pursuant to an order (the "**Receivership Order**") of the Court of Queen's Bench (Winnipeg Centre) (the "**Manitoba Court**") made in Court File No. CI 20-01-26627 (the "**Canadian Proceedings**"), Richter Advisory Group Inc. ("**Richter**") was appointed as receiver (in such capacity, the "**Receiver**") of the assets, undertakings and properties (the "**Property**") of Nygård Holdings (USA) Limited, Nygard Inc., Fashion Ventures, Inc., Nygard NY Retail, LLC (collectively, the "**US Debtors**""), Nygard Enterprises Ltd. ("**NEL**"), Nygard International Partnership ("**NIP**"),  Nygard Properties Ltd. ("**NPL**"), 4093879 Canada Ltd., and 4093887 Canada Ltd. (collectively, the "**Canadian Debtors** ") (the US Debtors and the Canadian Debtors together, the "**Nygard Group**" or the "**Debtors**") to exercise the powers and duties set out in the Receivership Order, pursuant to section 243(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, (the "**BIA**") and section 55 of *The Court of Queen's Bench Act*, C.C.S.M. c.C280.  A copy of the Receivership Order is attached as Appendix "A" to the Receiver's First Report dated April 20, 2020 (the "**First Report**") filed in support of the Receiver's motion returnable April 29, 2020 (the "**April 29 Motion**").

2.  Also on March 18, 2020, the Receiver, as the duly appointed foreign representative of the Debtors, commenced proceedings in the United States Bankruptcy Court for the Southern District of New York (the "**US Court**") by filing, among other things, petitions (the "**Chapter 15 Petitions**") on behalf of the Receiver in relation to the Debtors pursuant to sections 1504 and 1515 of the US Bankruptcy Code seeking recognition by the US Court of the Canadian proceedings as a foreign main proceeding (the "**Chapter 15 Proceedings**").  On March 26, 2020, the US Court entered, among other things, a provisional recognition order (the "**Provisional US Order**"), a copy of which is attached as Appendix "C" to the First Report.  On April 23, 2020, the US Court granted a final order recognizing, among other things, the Canadian Proceedings as the foreign main proceeding.  The Canadian Proceedings and the Chapter 15 Proceedings are together hereinafter referred to as the "**Receivership Proceedings**".

3.  In accordance with the Receivership Order, the Receiver has established a website (the "**Receiver's Website**") for the purposes of these proceedings at https://www.richter.ca/insolvencycase/nygard-group.

4.  Copies of the pleadings and other materials filed in the Receivership Proceedings, other than affidavits sealed by Order of the Manitoba Court, are posted to and available for review at the Receiver's Website.

5.  Copies of the pleadings and other materials filed in the Chapter 15 Proceedings are also posted to and available for review at the Receiver's Website.

6.  The Receiver has engaged Thompson Dorfman Sweatman LLP (Winnipeg) ("**TDS**") as its Canadian counsel, and Katten Muchin Rosenman LLP (New York) ("**Katten**") as its U.S. counsel.

## II. PURPOSE OF REPORT

7.   As noted above, the Receiver filed its First Report in support of the April 29 Motion.

8.   This report (the "**Supplementary First Report**") is filed by the Receiver to (i) provide the Manitoba Court with an update on certain developments in respect of the Receivership Proceedings subsequent to the issuance of the First Report, and (ii) respond to certain matters raised by counsel to the Nygard Group, Levene Tadman Golub Law Corporation, in its Brief dated April 24, 2020 (the "**Brief**") filed in response to the First Report, the April 29 Motion and an additional motion returnable April 29, 2020 brought by the Nygard Group.

## III. TERMS OF REFERENCE

9.   In preparing this Supplementary First Report, the Receiver has relied upon information and documents prepared by the Debtors and their advisors, including unaudited, draft and/or internal financial information, the Debtors' books and records, discussions with representatives of the Debtors, including current and former employees, executives and / or directors, legal counsel to Mr. Peter Nygard and certain related but non-Debtor entities, the Lenders and their legal counsel, and information from third-party sources (collectively, the **"Information"**).   In accordance with industry practice, except as otherwise described in the Supplementary First Report, Richter has reviewed the Information for reasonableness, internal consistency, and use in the context in which it was provided.   However, Richter has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would comply with Generally Accepted Auditing Standards (**"GAAS"**) pursuant to the *Chartered Professional Accountant of Canada Handbook* and, as such, Richter expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information.

10.  The Receiver has prepared this Supplementary First Report in its capacity as a Court-appointed officer to support the relief being sought by the Receiver at the April 29 Motion.   Parties using this Supplementary First Report, other than for the purposes outlined herein, are cautioned that it may not be appropriate for their purposes, and consequently should not be used for any other purpose.

11.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Receivership Order or the First Report.

12.  Unless otherwise noted, all monetary amounts contained in this Supplementary First Report are expressed in Canadian dollars.

## IV. CORPORATE CREDIT CARD ACTIVITY / DOCUMENT ACCESS

13.   In the First Report, the Receiver reported on certain questionable expenses (the **"Potential Personal Expenses"**) charged to the corporate Mastercard facility established by NIP by certain (now former) employees of the Nygard Group in the days leading up the granting of the Receivership Order.   The Receiver also noted that the majority of the Potential Personal Expenses were concentrated among seven (now former) Nygard Group employees (the **"Identified Employees"**), including two (now former) directors of certain of the Nygard Group entities: Mr. Greg Fenske and Ms. Tiina Tulikorpi.

14.   In the Brief, the Nygard Group queries whether it was proper for the Receiver to only disclose the names of the above-noted individuals and not the other Identified Employees suspected of similar potential misconduct.   Further, in the Receiver's view, the Brief seeks to inappropriately conflate a supposed lack of evidentiary support provided to the Receiver by these former Nygard Group employees with the document access issue, which was discussed in detail in the First Report.

15.   The Receiver identified Mr. Fenske and Ms. Tulikorpi given their status as directors of certain of the Nygard Group entities.   In addition, in his response to the Receiver's queries regarding the Potential Personal Expenses, which is attached as Appendix "M" to the First Report, Mr. Fenske stated that, "*the NYGARD company led by Mr. Nygard personally has been aggressive in its response to the COVID 19 crisis, and these purchases were in direct reaction. While Mr. Nygard agreed with this plan, the decision was mine*".   Ms. Tulikorpi similarly informed the Receiver that Mr. Nygard had authorized, and in certain instances directly requested, particular purchases attributed to her.   It is also worth noting that, in her response to the Receiver, which is attached as part of Appendix "M" to the First Report, Ms. Tulikorpi identifies certain charges not related to any of the Nygard Group entities subject to the Receivership Proceedings.   Rather, as noted by Ms. Tulikorpi, the charges were for the benefit of Edson's Investments Ltd. (the **"Edson's Charges"**), another entity controlled by Mr. Nygard.   Ms. Tulikorpi noted that no invoices supporting the Edson's Charges would be provided to the Receiver, as these charges were not related to the Debtors.

16.   The Receiver is currently investigating to what extent other Identified Employees were acting at the direction of senior managers, directors, or Mr. Nygard and, as such, the Receiver has not disclosed the name of the other Identified Employees at this time.

17.   The Receiver notes that none of the Identified Employees requested access to their work documents or other documents in the control of the Receiver in order to respond to the Receiver's request to provide documentation to support the Identified Employee's claims that the Potential Personal Expenses were business-related expenses.   As noted in the First Report, several Identified Employees provided the Receiver with original receipts that, in the

Receiver's view, provided compelling evidence that the Potential Personal Expenses may not be business-related expenses.

18. As detailed in the First Report, the requests made by legal counsel for Mr. Nygard and certain other non-Debtor members of the larger Nygard organization for both access to and / or possession of property, including books and records, purportedly under the possession or control (or subject to the possession or control) of the Receiver is part of larger, more complex issue, which the Receiver has attempted to address with the proposed Documents and Electronic Files Access Order being sought at the April 29 Motion.

## V. DELETION OF DOCUMENTS

19. As noted in the First Report, on or about February 25, 2020, the United States District Court for the Southern District of New York issued a Grand Jury subpoena (the "**Grand Jury Subpoena**") to Nygard, Inc., commanding the production of a wide range of documents and electronic files. The Receiver has, with assistance from its legal counsel, been coordinating the production of certain documents and information in response to the Grand Jury Subpoena.  Certain of the information requested by the Assistant US Attorney handling the matter pertains to the Debtors' data retention policies as well as information concerning or reflecting the purging of data.  In connection therewith, the Receiver met with certain of NIP's IT personnel to understand the Debtors' document retention procedures and what steps, if any, where taken by the Debtors' in response to the Grand Jury Subpoena.

20. The Receiver understands that on February 26, 2020, Mr. Abe Rubinfeld, (now former) general counsel to the Nygard Group, issued a memorandum (the "**Legal Hold Notice**") by email to certain employees / management of the Nygard Group  of the requirement to retain and preserve all documents and any other materials relating in any way to, among other things, (i) Mr. Nygard and (ii) Nygard Inc., NIP, and Nygard Holdings Limited.  On February 27, 2020, a copy of the Legal Hold Notice was sent by email to all Nygard employees.  A copy of the Legal Hold Notice is attached hereto as **Appendix "A"**.

21. On April 24, 2020, the Receiver was provided with a summary of data / document deletion activity by user (the "**File Deletion Logs**") on the Debtors' file servers since February 27, 2020.  Based on the information received, it appears a number of data / documents were deleted by users after the issuance of the Legal Hold Notice.  The Receiver, however, continues to investigate the matter, as the Debtors' IT staff explained that a number of the transactions pertain to system generated deletions of temporary files and other normal course activities by IT staff in order to preserve storage space on the Debtors' servers.

22. Of particular interest to the Receiver was the activity that occurred on the file servers on the Appointment Date, in which a total of 10,488 files were deleted, the majority of which were concentrated among three users.  Based on the Receiver's preliminary review of the File Deletion Logs, two of the users appear to be IT accounts engaging in

the aforementioned IT maintenance activities.  The third user was identified as "Nygard.com\Greg Fenske GGF5140", which appears to be Mr. Fenske.  This User deleted a total of 1,059 files on March 18, 2020, between 8:44am CST and 6:37pm CST (the "**Fenske File Deletion Log**").  The Receiver notes that in the three (3) weeks prior to the Appointment Date, this user had very little deletion activity.  This user was among one of many users whose access to the Debtors' networks was disabled by the Receiver in order to preserve and protect the Debtors' Property upon appointment.  Attached hereto as **Confidential Appendix "1"** is a copy of the Fenske File Deletion Log.  In light of the sensitive commercial information contained in the Fenske File Deletion Log, the Receiver is of the view that the Fenske File Deletion Log should be sealed pending further Order of the Manitoba Court.

23.   The Receiver continues to review the File Deletion Logs, including the Fenske File Deletion Log, to determine the appropriateness of the data / document deletions in light of the Legal Hold Notice and the Grand Jury Subpoena, and for other reasons.  The Receiver is currently working with the Debtors' IT staff to attempt to recover the deleted data / documents.  The Receiver continues to review this matter and will consider with counsel what appropriate further action to take, if any.

## VI. OTHER MATTERS

**Update on Winnipeg Properties**

24.   As noted in the First Report, NPL owns three properties in Winnipeg, Manitoba.  The municipal address for each of the properties is as follows:

(a)   702-708 Broadway Avenue, Winnipeg, Manitoba ("**Broadway**");

(b)   1300, 1302 and 1340 Notre Dame Avenue, Winnipeg, Manitoba ("**Notre Dame**"); and

(c)   1771 Inkster Boulevard, Winnipeg, Manitoba ("**Inkster**", and together with Broadway and Notre Dame, the "**Winnipeg Properties**").

25.   The Receiver received four proposals from brokers to market and sell the Winnipeg Properties (the "**Winnipeg Real Estate Proposals**").  The Receiver reviewed the Winnipeg Real Estate Proposals and prepared a schedule summarizing / comparing the key terms of each (the "**Winnipeg Real Estate Proposal Summary**"), a copy of which is attached hereto as **Confidential Appendix "2"**.  In light of the sensitive commercial information contained in the Winnipeg Real Estate Proposal Summary, the Receiver is of the view that the Winnipeg Real Estate Proposal Summary should be sealed pending further Order of the Manitoba Court.

26.   As at the date of the First Report, the Receiver was in the process of negotiating a listing agreement with one of the brokers that submitted a proposal.  On April 21, 2020, the Receiver, White Oak and Colliers International ("**Colliers**")

entered into a listing agreement in respect of the Winnipeg Properties, a copy of which is attached hereto as **Appendix "B"**.  The key terms of the listing agreement for the Winnipeg Properties include:

(a)     a listing term of 120 days, subject to mutual extension rights for successive 30-day periods thereafter;

(b)     the Winnipeg Properties are to be listed on MLS for broad exposure; and

(c)     a total commission of 2% on the gross sale value to be split 60/40 between Colliers and a cooperating broker, if any.

27.    The Receiver understands the Winnipeg Properties will each be listed on MLS on or about April 27, 2020.

**KERP**

28.    As noted in the First Report, the Receiver was seeking the approval of a key employee retention plan (the "**KERP**") for certain of the Nygard Group employees (collectively, the "**Eligible Employees**") considered critical to the Debtors' operations and to the success of the Receivership Proceedings.  As at the date of the First Report, the Receiver was in the process of finalizing the terms of a KERP with the Eligible Employees, which would then be presented to the Manitoba Court by way of a supplementary report for review and approval on the within motion.

29.    While the Receiver continues to view the retention of the Eligible Employees as important to the success of these Receivership Proceedings and the Realization Process, the Receiver, in consultation with the Lenders, has determined that approval of a KERP is no longer necessary in the circumstances.  The Receiver notes it may consider other alternatives to ensure the retention of the Eligible Employees, pursuant to the Receiver's powers under the Appointment Order.

**Goods in Transit**

30.    As detailed in the First Report, the Nygard Group sources certain of its inventory and other items related to its operations from a variety of overseas manufacturers and relies on a global network of carriers, freight forwarders and transportation service providers. These service providers coordinate and process various import duties and related charges at ports or transportation centres and transport the inventory to the Debtors' warehousing and distribution centres located in Canada and the US.  The Receiver and CRSA Global Logistics Inc. and Overseas Express Consolidators Inc. (collectively the "**Freight Forwarders**") have engaged in numerous discussions since the Appointment Date regarding approximately USD $12 million of cost value goods (the "**Goods**") ordered by the Debtors prior to Receiver's appointment.  The Goods are currently in the custody of the Freight Forwarders awaiting customs clearance at various ports throughout Canada and the US.  The Receiver understands that the Freight Forwarders claim they are owed $1.8 million in connection with the Goods and that while certain of the Goods may

have been consigned to the Nygard Group, the Debtors do not hold the original bills of lading needed for customs clearance on the majority of the Goods.

31. The Receiver understands that the Freight Forwarders sent a letter of demand dated April 6, 2020 to a number of the overseas manufacturers to notify them of the Freight Forwarders intention to (i) exercise of lien rights over the Goods shipped by the manufacturers and consigned to Nygard, and (ii) sell the Goods in question in order to recover amounts owed to the Freight Forwarders, failing confirmation by the manufacturer to pay the outstanding amounts and costs required to return the Goods to the port of origin. Counsel to the Freight Forwarders subsequently sent a notice of sale dated April 17, 2020 (the "**Notice of Sale**") to notify certain of the overseas manufacturers of the Freight Forwarders intention to initiate the process of selling the Goods without further notice or delay. In response to the Notice of Sale, certain of the manufacturers contacted the Receiver to request information on the Receiver's or Debtors' intended course of action with the respect to the Goods.

32. On April 24, 2020, counsel to the Freight Forwarders wrote to the Receiver in connection with the amounts owed to the Freight Forwarders and requested certain amendments to the Consulting and Marketing Services Agreement to address the status of the Goods as it relates to the Liquidation Sale. The Receiver is the view that amendments to the Consulting and Marketing Services Agreement are not needed and the Freight Forwarders' concerns could be addressed in the Sale Approval Order. Accordingly, the Receiver, through its counsel, responded to the Freight Forwarders to propose adding language in the Sale Approval Order to clarify that In-Transit Inventory (as defined in the Consulting and Marketing Services Agreement), shall not, subject to further court order, include goods produced for the Debtors in the possession of a third party having a lawful right to possession thereof and which are not agreed by the third party to be included in the Liquidation Sale or in the sale of Wholesale Inventory (as defined in the Consulting and Marketing Services Agreement).

All of which is respectfully submitted on this 27th day of April, 2020.

**Richter Advisory Group Inc.**
**in its capacity as Receiver of**
**Nygard Holdings (USA) Limited, Nygard Inc., Fashion Ventures, Inc.,**
**Nygard NY Retail, LLC, Nygard Enterprises Ltd., Nygard Properties Ltd.,**
**4093879 Canada Ltd., 4093887 Canada Ltd., any Nygard International Partnership**
**and not in its personal capacity**

_____                    _____
**Adam Sherman, MBA, CIRP, LIT**                    **Pritesh Patel, MBA, CFA, CIRP, LIT**

# APPENDIX A

_____

**From:** Abe Rubinfeld AXR6966 <Abraham.Rubinfeld@Nygard.com>
**Sent:** February 27, 2020 5:55 PM
**To:** Nygård All <NygardAll@Nygard.com>
**Subject:** Litigation Hold - Jane Doe law suit - notice


**Attached is a litigation hold notice with respect to the Jane Doe lawsuit.  No documents, electronic or physical are to be destroyed.  If you have any questions please call.**


*Abe.Rubinfeld@Nygard.com*
*VP General Counsel*
**416 598 6966**
**Visit: www.Nygard.com**

## Memorandum

**To:**            Peter J. Nygard; all of Mr. Nygard's companies (collectively, the "Nygard Companies"); all employees of the Nygard Companies; and all staff at any of Mr. Nygard's properties

From:         Abe Rubinfeld, General Counsel for the Nygard Companies

Subject:     Document Hold Notice

Date:        February 26, 2020

---

This memorandum is being sent to (i) Peter J. Nygard, (ii) all of Mr. Nygard's companies, including but not limited to, Nygard Inc., Nygard International Partnership, and Nygard Holdings Limited (collectively, the "Nygard Companies"), (iii) all employees of the Nygard Companies, and (iv) all staff at any of Mr. Nygard's properties, including but not limited to, in the Bahamas, California, Winnipeg, and Toronto (collectively, the "Nygard Properties"), and is to serve as notice that, due to the ongoing lawsuit, *Jane Does Nos. 1-10 v. Nygard, et al.*, Case No. 20-cv-01288 (ER) (the "Lawsuit"), as well as the investigation being conducted by the United States Attorney's Office for the Southern District of New York (the "Investigation"), ***all recipients of this memorandum must retain and preserve all documents and any other materials relating in any way to Mr. Nygard, the Nygard Companies, or the Nygard Properties, including any events or occurrences at the Nygard Properties***.

Because of the Lawsuit and Investigation, *it is crucial that you continue to take affirmative steps to preserve paper documents, electronically stored information, and physical items that are in your custody or control and fall within any of the broad categories set forth above.* Additionally, until further notice, *do not discard, delete, overwrite, alter, or destroy any relevant paper documents or other physical items, or alter or destroy electronically stored information.* Further, until further notice, *suspend any document destruction policies, to the extent any such policies are in effect.*

Please note that *failure to preserve these materials or any other materials that fall within the scope of any of the categories set forth above could be detrimental to Defendants' position with respect to the Lawsuit, could constitute obstruction of the Investigation, and could result in, among other things, criminal prosecution and/or other sanctions, as well as financial penalties and termination of your employment. The requirements to preserve all materials as described in this memorandum remain in full effect until further notice.*

If you have any doubt as to whether this notice applies to a specific document, physical item or communication, you should err on the side of caution by preserving the item. If you have any questions or concerns, please contact me.

/s/  Abe Rubinfeld
_____
Abe Rubinfeld
General Counsel for the Nygard Companies

# APPENDIX B

Colliers International        5th Floor, 305 Broadway MAIN  +1 204 943 1600
                             Winnipeg, Manitoba R3C 3J7        FAX   +1 204 943 4793
                             www.colliers.com



**April 21, 2020**

**EXCLUSIVE AUTHORITY TO SELL  ("Listing Agreement")**

Richter Advisory Group Inc. is a party to this Listing Agreement solely in its capacity as receiver of the assets, properties and undertakings of, *inter alia*, Nygard Properties Ltd. (the "**Company**") (and not in its personal or corporate capacities), pursuant to that certain order (the "**Receivership Order**") of the Manitoba Court of Queen's Bench made March 18, 2020 in File No. CI 20-01-26627 (the "**Receivership Proceedings**").  For certainty, references to "**Seller**" in the Listing Agreement shall be a reference to "Richter Advisory Group Inc., solely in its capacity as receiver for Nygard Properties Ltd.".

The Seller hereby appoints Colliers International (hereinafter called "**Colliers**") as its sole and exclusive agent to market the "Premises" described below, subject to the provisions detailed herein.

White Oak Commercial Finance, LLC, in its capacity as administrative and collateral agent (the "**Agent**") under the Credit Agreement dated as of December 30, 2019 by and among, *inter alia*, the Agent, White Oak Commercial Finance, LLC and Second Avenue Capital Partners, LLC as lenders, and the Company, shall be a party to this Listing Agreement. Seller, Colliers, the Company and the Agent are collectively referred to herein as the "Parties".

*Term of Listing*

This agreement shall commence upon the date of execution hereof and shall expire one hundred twenty (120) days following the execution hereof.  Following the term of this listing the Seller and Colliers, with the consent of the Agent, may mutually extend this Listing Agreement for successive thirty (30) day periods.

*Premises*

The "Premises" shall be and shall be deemed to include only all of the right, title and interest of the Company in the real property known as 1771 Inkster Boulevard, 1300, 1302 and 1340 Notre Dame Avenue and 702 & 708 Broadway all located in Winnipeg, Manitoba.

*Agency Relationship*

The Seller acknowledges and agrees that although Colliers is the Seller's agent and represents the Seller, Colliers is free to provide to all prospective purchasers market information that Colliers deems necessary to properly inform the prospective purchaser.

Colliers acknowledges that, pursuant to the Receivership Order, the Company is in possession and control of the Premises and the Receiver will use reasonable efforts to accommodate access to the Premises for Colliers' marketing purposes.

### *Asking Sale Price*

The "asking" sale price for each of the Premises shall be as directed by the Seller and Agent. The sale shall be conducted upon the terms set out herein, or at such other price and/or terms acceptable to the Seller and Agent. It is understood that the price and/or terms set out herein are at the Seller's request, after full discussion with Colliers' representative regarding potential market value of the Property. Until further notice the "asking" sale price for each property shall be:

- 1771 Inkster Boulevard - $8,500,000.00
- 1300, 1302, and 1340 Notre Dame Avenue - $5,245,000.00
- 702 & 708 Broadway - $2,495,000.00

Changes to the price at which the Premises is listed for sale shall require the consent of the Seller and the Agent, after discussion with Colliers' representative in relation thereto.

### *Colliers' Duties*

Colliers shall conduct wide-exposure marketing of the Premises, including listing each of the Premises on MLS, and shall encourage cooperation with Winnipeg's community of commercial/industrial real estate agents.  Colliers shall provide a weekly status report to the Seller which will include a list of all prospects who have toured the Premises.

Except as may be expressly agreed by the Seller and the Agent, and notwithstanding anything to the contrary contained in this Listing Agreement, the sale of the Premises shall be conducted on a strictly "as is, where is" basis, without representations or warranties by the Seller of any kind whatsoever.

### *Advertising & Promotion*

All marketing and promotional costs including, pieces and signage, shall be prepared and/or ordered by Colliers, at Colliers cost.

### *Inquiries*

The Seller shall refer any and all inquiries from any source whatsoever to Colliers.

### *Deposits and Balance Payable*

Deposits presented with an Offer to Purchase shall be made payable to "COLLIERS INTERNATIONAL in trust" and Colliers agrees to hold such funds in a trust account in accordance with the provincial statutes until the closing of a sale.

Any Offer to Purchase shall provide that the balance of the purchase price for any premises shall be paid to Thompson Dorfman Sweatman LLP, as counsel to the Seller.

### *Real Estate Commissions*

The Seller shall pay Colliers a commission (plus GST) forthwith once the Premises have been processed through the Land Titles Office, subject to the following provisions:

(a)  any sale shall be subject to and conditional upon obtaining a final order approving ("**Court Approval**") in the Receivership Proceedings such sale and, for greater certainty, no commission shall be payable in respect of any sale for which Court Approval is not granted;

(b)  In the event of a sale, the Seller shall pay Colliers a commission equal to two per cent (2%) of the final sale or disposition value for each Premises sold (exclusive of applicable taxes). Should the purchaser be introduced to the property by a third-party brokerage, Colliers will share the fee on a 60% to 40% basis in the favor of Colliers. All commissions are subject to and shall include GST;

(c)  any commission payable hereunder shall be paid only upon the completion of a sale, and Colliers hereby authorizes and directs the Seller to pay from the proceeds of any sale, the balance (after application of any deposit in accordance with the terms of the Listing Agreement) of any commission properly payable pursuant to the terms of the Listing Agreement.  For certainty, no commission may be released to or by Colliers until such time as it may be released in accordance with the Court Approval;

(d)  if a prospective purchaser is introduced to the Premises by Colliers during the term of this Listing Agreement and enters into a purchase of the Premises within three (3) months after the termination of this Listing Agreement, a full commission shall be deemed earned and payable to Colliers upon completion of a sale and occupancy of the Premises by the purchaser;

(e)  at the Seller's election, subject to Agent consent, Colliers shall host an auction of any Premises, which auction may include a "stalking horse" bidder if the Seller so elects with the Agent's consent;

(f)  Should a prospective purchaser fail to complete a purchase transaction and forfeit to the Seller its deposit monies as liquidated damages, then zero percent (0%) of the deposit funds shall be paid to Colliers for services rendered.

### *Notices*

Any notice, document or communication required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand to the party to which it is to be given as follows:

If to Colliers:

Colliers International
305 Broadway, Suite 500
Winnipeg, Manitoba, Canada

R3C 3J7
Facsimile #:
Attention: Tom Derrett
Email: tom.derrett@colliers.com

in the case of the Seller at:

Richter Advisory Group Inc.
181 Bay Street, Suite #3510
Toronto, Ontario, Canada
M5J 2T3
Attention: Pritesh Patel
Email: PPatel@Richter.ca

with copies to:

Thompson Dorfman Sweatman LLP
1700-242 Hargrave Street
Winnipeg, Manitoba, Canada
R3C 0V1
Attention: Bruce Taylor
Email: gbt@tdslaw.com

        -and-

White Oak Commercial Finance, LLC
1155 Avenue of the Americas, 15th Floor
New York, New York 10036
United States of America
Email: gschwartz@whiteoakcf.com

        -and-

Osler, Hoskin & Harcourt LLP
1 First Canadian Place
100 King Street West, Suite 6200
Toronto, Ontario, Canada
M5X 1B8
Attention: Marc Wasserman
Email: mwasserman@osler.com

Notices may also be given by email.  Either party may change its address by written notice to the other party.

Time shall be of the essence in this Agreement.  This Agreement shall be binding upon our respective successors and assigns.  The parties hereto agree that the foregoing correctly set forth the terms of this Agreement, dated as below written.

RICHTER ADVISORY GROUP INC., solely in its capacity as Receiver of the assets, undertakings and properties of NYGÅRD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC., NYGARD NY RETAIL, LLC, NYGARD ENTERPRISES LTD, NYGARD PROPERTIES LTD., 4093879 CANADA LTD., 4093887 CANADA LTD., and NYGARD INTERNATIONAL PARTNERSHIP and not in its personal or corporate capacity

Per: _____
Pritesh Patel, Senior Vice President
I have the authority to bind the Company


WHITE OAK COMMERCIAL FINANCE, LLC, in its capacity as administrative and collateral agent, solely with respect to the rights provided to the Agent pursuant to this Agreement

Per: _____
Glenn Schwartz, Senior Vice President
I have the authority to bind the Company


COLLIERS INTERNATIONAL

Per: _____

I have the authority to bind the Company


Per: _____
I have the authority to bind the Company

**RICHTER ADVISORY GROUP INC., solely in its capacity as Receiver of the assets, undertakings and properties of NYGÅRD HOLDINGS (USA) LIMITED, NYGARD INC., FASHION VENTURES, INC., NYGARD NY RETAIL, LLC, NYGARD ENTERPRISES LTD, NYGARD PROPERTIES LTD., 4093879 CANADA LTD., 4093887 CANADA LTD., and NYGARD INTERNATIONAL PARTNERSHIP and not in its personal or corporate capacity**

Per: _____

Pritesh Patel, Senior Vice President
I have the authority to bind the Company

**WHITE OAK COMMERCIAL FINANCE, LLC, in its capacity as administrative and collateral agent, solely with respect to the rights provided to the Agent pursuant to this Agreement**

Per: _____

I have the authority to bind the Company

**COLLIERS INTERNATIONAL**

Per: _____
DAN CHUBEY
MANAGING DIRECTOR

I have the authority to bind the Company

Per: _____

I have the authority to bind the Company